[Cite as *In re C.W.*, 2011-Ohio-4756.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: C.W., J.W., and H.W. | : | APPEAL NO. C-110342 |
| | | TRIAL NO. F08-1032 |
| | : | |
| | : | *O P I N I O N.* |

Civil Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 21, 2011

*Raymond Becker*, for Appellant Christa Williams,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *John Hatcher*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Peggy Ann Markstein*, Guardian Ad Litem for C.W., J.W., and H.W.

Please note:  This case has been removed from the accelerated calendar.

**Sylvia Sieve Hendon, Judge.**

{¶1}    Appellant Christa Williams appeals the judgment of the Hamilton County Juvenile Court granting permanent custody of three of her children, C.W., J.W., and H.W., to the Hamilton County Department of Job and Family Services ("HCJFS").

### Factual Background

{¶2}    In April 2008, HCJFS initiated proceedings to obtain custody of five of Williams' children. The oldest children, C.F., M.W., and S.W., were 12, nine, and eight years old, respectively. C.W. was two years old, and J.W. was 11 months old. At that time, H.W., the youngest of Williams' six children, had not yet been born.

{¶3}    Williams stipulated to the following facts that had been alleged in HCJFS's complaint for temporary custody:

{¶4}    "[C.F.] is diagnosed with developmental disabilities and exhibits marked speech problems. [C.F.] has received services from MRDD[1] in the past, but Ms. Williams decided that he no longer needed them, and believed that if the service was to continue, it would be in-home. Ms. Williams reports that she continues to receive SSI benefits for [C.F.'s] disability.

{¶5}    "On March 11, 2008, HCJFS received an allegation that [M.W. and S.W.] were not attending school on a consistent basis and were coming to school dirty. HCJFS went to Ms. Williams' home on March 11. Ms. Williams met the social worker at her car and said she was leaving. After Ms. Williams left, the worker knocked on the door which was answered by [C.F.]. Police were called and in the

---

[1] "MRDD" is an acronym for the Hamilton County Board of Mental Retardation and Developmental Disabilities. The agency's name has been changed to the Hamilton County Board of Developmental Disabilities Services.

interim[,] a person identifying herself as Ms. Williams['] live in sister arrived and allowed HCJFS into the home. The home had a foul odor and the children were very dirty. The entry hallway presented a safety hazard as the egress was blocked by a large screen television and a couch. Food crumbs, dirty baby bottles, opened food cans, overturned plants and clothes littered the floors. The gas stove had two burners burning on high flame though nothing was cooking on them. A chair was pushed against the stove. The door to the basement was open and garbage and rusted metal covered the floor. Mother also was referred for a diagnostic assessment and a ["]help me grow["] referral was made for the family.

{¶6}   "On March 5, 2008, Ms. Williams was convicted of two counts of failure to send to school in relation to [M.W. and S.W.]

{¶7}   "On April 1, 2008[,] HCJFS appeared at the Williams home for a scheduled visit. The home was again observed to be disorganized. The television and couch remained in the entry hallway. Empty cans of food with sharp edges were found on the floor. Full garbage bags were stacked around the living areas of the home. Garbage was noted on the floors in the living areas. Limited food was in the refrigerator. Broken glass was found on the floor near [C.W. and J.W.] [C.W.] had no shoes on and was dragging the baby around the room. When asked if she needed help with cleaning the glass, Ms. Williams remained seated on the couch and told HCJFS to clean it up. A window without glass or screen was observed in the room covered only by a blanket. One boxspring was observed in Ms. Williams['] room. Ms. Williams reports that she, her sister Michelle, [C.W., and J.W.] sleep on the boxspring. [J.W.'s] crib is filled with garbage bags and household items. [C.F., M.W., and S.W.] sleep on couches. Ms. Williams and the children were observed to have very poor hygiene and exhibited a strong body odor.

{¶8}   "Ms. Williams exhibits symptoms of mental illness but denies being diagnosed with a mental illness. HCJFS has observed inconsistent statements made

by Ms. Williams and drastic mood swings. Ms. Williams was told on April 1, 2008 that she had a diagnostic assessment scheduled on April 17, 2008. Ms. Williams stated that she would not attend the assessment. Subsequent to the removal of the children by HCJFS on April 1, 2008, Ms. Williams phoned the HCJFS worker who had just removed the children from her home to report that the workers from Help Me Grow had just taken her children."

{¶9} The whereabouts of the children's fathers was unknown.

{¶10} In June 2008, the children were adjudicated dependent and neglected, and were placed into the temporary custody of HCJFS. The court ordered Williams to comply with mental-health and case-management services and to complete parenting classes. The court also required her to obtain stable housing and employment.

{¶11} C.W. and J.W. were placed in the same foster home. Both exhibited profound developmental delays and significant behavioral problems and required extensive supportive services.

{¶12} When C.W. entered foster care, she exhibited masturbatory behaviors associated with victims of sexual abuse. She lacked appropriate physical boundaries and would approach strange adults as if she knew them. C.W. required individual counseling and psychiatric medications for anxiety and behavioral issues. She attended speech, occupational, and physical therapy. According to C.W.'s therapist, C.W. needed a stable home environment with predictable limits and consequences. Moreover, C.W. required caregivers who were able to respond appropriately to her emotional, physical, and developmental needs.

{¶13} When J.W. entered foster care, he had significant developmental and speech delays. He engaged in aggressive behavior and had attachment and sensory issues. J.W. was enrolled in a therapeutic preschool program, and received speech, occupational, and physical therapy. His therapist testified that due to J.W.'s

intensive, ongoing needs, he required a calm, nurturing environment and a very organized home, with caregivers who could accompany him to his numerous appointments.

{¶14} In March 2009, HCJFS moved to modify temporary custody of the children to permanent custody.

{¶15} In May 2009, Williams went to a hospital emergency room. She stood up from her wheelchair in triage and gave birth to her sixth child, H.W. The infant hit her head on the floor, and the umbilical cord was severed. As a result, H.W. was in an intensive-care unit, using a breathing tube and a feeding machine, for two weeks.

{¶16} At the time of H.W.'s birth, Williams was homeless and had been homeless for approximately one year. Williams initially identified a man that she had met only two months earlier as the infant's father. When she was told that that was medically impossible, she named another man as the father, but she was unable to provide any identifying information about him.

{¶17} Interim custody of the infant was granted to HCJFS. Then, in June 2009, HCJFS moved for permanent custody of H.W.

{¶18} In July 2009, HCJFS withdrew its motions for permanent custody of Williams' oldest three children, because they had been placed in Planned Permanent Living Arrangements.

{¶19} During their time in foster care, C.W. and J.W. demonstrated significant developmental progress as a result of their caregivers' addressing their extensive needs.

{¶20} In June 2010, the magistrate recommended granting permanent custody of C.W., J.W., and H.W. to HCJFS. In May 2011, the trial court overruled Williams' objections to the magistrate's decision and adopted the decision as the judgment of the court.

***Manifest Weight of the Evidence***

{¶21} In her first assignment of error, Williams argues that the trial court erred by granting permanent custody of C.W., J.W., and H.W. to HCJFS. She contends that the judgment was against the manifest weight of the evidence.

{¶22} A court may grant a motion for permanent custody if it determines by clear and convincing evidence that (1) permanent custody is in the child's best interest, and (2) the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a).

{¶23} Clear and convincing evidence is that which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613. A reviewing court will not reverse the judgment of a trial court as being against the manifest weight of the evidence if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence. *In re McCluskey*, 1st Dist. No. C-050702, 2006-Ohio-4034, ¶14.

{¶24} In determining a child's best interest, a court must consider all relevant factors, including (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child, (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, (3) the custodial history of the child, including whether the child has been in the temporary custody of children services agencies for 12 or more months, and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody. R.C. 2151.414(D)(1).

{¶25} Our review of the record convinces us that the trial court considered each of these factors and that the court's granting of permanent custody was based on competent, credible evidence. The court considered evidence of (1) the children's relationships with their mother and with their foster parents, (2) the guardian ad litem's recommendation to grant permanent custody of the children to HCJFS, (3) the children's custody in their foster homes, and (4) the inability of Williams to provide a stable, permanent home.

{¶26} Williams, though, asserts that the trial court lacked sufficient evidence to find that the children could not be placed with her within a reasonable time or should not be placed with her. Such a finding is mandatory when a court concludes that any one of several statutory factors applies to each parent. R.C. 2151.414(E).

{¶27} After considering competent, credible evidence, the trial court concluded that the factor in R.C. 2151.414(E)(1) applied to Williams because she had not substantially remedied the conditions causing the children to be placed outside her home despite reasonable efforts by HCJFS to reunify the family. See R.C. 2151.414(E)(1).

{¶28} In making that determination, the court relied on evidence that Williams had made little progress despite her participation in services made available to her by HCJFS. She had received extensive parenting coaching, but she had been unable to effectively manage the children or meet their needs during supervised visitation. At no point did Williams' visitation with the children progress to a point where she was able to have unsupervised contact with them. She demonstrated only a superficial understanding of the intensive needs of C.W. and J.W., and did not participate in their day-to-day therapeutic sessions.

{¶29} Throughout much of the proceedings, Williams had been unable to maintain stable housing. Moreover, despite efforts by HCJFS to educate Williams on

hygiene issues, the court found that she was "not able to maintain herself in a healthy and clean manner, much less three children." Consequently, we hold that the trial court's determination that C.W., J.W., and H.W., could not be placed with Williams within a reasonable time or should not be placed with her was based on competent, credible evidence.

{¶30} Because sufficient evidence supported the award of permanent custody to HCJFS, we overrule the first assignment of error.

### *Psychiatric Expert*

{¶31} In her second assignment of error, Williams argues that the trial court erred when it denied her request for the appointment of a psychiatric expert to aid in the presentation of her case.

{¶32} Due process requires the appointment of a psychiatric expert in permanent-custody proceedings where a parent's mental or emotional health is the predominant and determinative issue. See *In re Brown* (Nov. 26, 1986), 1st Dist. No. C-850878; *In re Shaeffer Children* (1993), 85 Ohio App.3d 683, 621 N.E.2d 426. But where a parent's mental health is not at issue, psychiatric expertise would contribute little to the proceedings and is not required. *Brown*, supra.

{¶33} The trial court's finding that the children could not be placed with Williams within a reasonable time was based upon her failure to substantially remedy the conditions that had caused the children to be placed outside her home, a statutory factor in R.C. 2151.414(E)(1). The court did *not* base its finding upon the existence of the R.C. 2151.414(E)(2) factor, that is, that she suffered chronic mental illness or chronic emotional illness. See *In re B.G.*, 8th Dist. No. 81982, 2003-Ohio-3256, ¶23. Because Williams' mental health was not the predominant issue or determinative issue in the court's permanent-custody decision, a psychiatrist's

8

testimony was not necessary to counter any allegation that her mental condition had affected her parenting ability. Id.

{¶34} Accordingly, we hold that due process did not require the court to appoint a psychiatric expert to assist her in her defense, and we overrule the second assignment of error.

### The ADA and the Rehabilitation Act of 1973

{¶35} In her third assignment of error, Williams argues that the termination of her parental rights violated her rights under the Americans with Disabilities Act of 1990 ("ADA"), Section 12101, et seq., Title 42, U.S.Code, and the Rehabilitation Act of 1973, Section 794, Title 29, U.S.Code. She contends that HCJFS did not reasonably accommodate her disability insofar as "services were not available to her because of her disability," thereby rendering futile her efforts toward reunification.

{¶36} In March 2010, the court denied Williams' motion to provide services to accommodate her disability. At a hearing on her motion, Williams specifically agreed, and the court held, that HCJFS had offered all relevant and available services. The court noted that HCJFS had provided Williams hands-on parenting training, mental-health services, and case-management services. The court noted that Williams had been referred to MRDD, but had not been able to establish her eligibility for its services.

{¶37} The Rehabilitation Act proscribes discrimination based upon a person's disability by any program or activity receiving federal financial assistance. Id. Nothing in the record indicated that HCJFS was the recipient of federal funds, a prerequisite for an action under the Rehabilitation Act. See id; see, also, *In re Rodriguez* (Aug. 4, 1999), 9th Dist. No. 98CA007073. Consequently, Williams failed to establish that she had a right to protection under the Act.

9

{¶38}   Even if proof of federal funding had been present in the record, Williams failed to demonstrate that she was disabled for purposes of either the Rehabilitation Act or the ADA.

{¶39}   Because similar standards govern Williams' ADA and Rehabilitation Act claims, we will discuss the claims together.  See *Bartell v. Lohiser* (C.A.6, 2000), 215 F.3d 550, 560.  Title II of the ADA prohibits public entities from discriminating based on disability.  Section 12132, Title 42, U.S.Code.  The procedure for enforcing the ADA begins with the filing of a complaint with a designated agency.  Section 12133, Title 42, U.S.Code.  If appropriate, the agency will refer the case to the Department of Justice which may file suit in a federal district court.  Id.  An alternative procedure is for a private individual to directly initiate an action, with or without waiting for the federal administrative procedure to run its course.  Id.

{¶40}   Ohio courts have refused to apply the ADA so as to provide a defense to individuals in permanent-custody actions initiated by public children-services agencies.  See *In re Moore* (Sept. 5, 2000), 12th Dist. No. CA99-09-153; *In re Harmon* (Sept. 25, 2000), 4th Dist. No. 00 CA 2694; *In re D.J.*, 12th Dist. No. CA2008-06-142, 2008-Ohio-5424.  For example, in *In re Rodriguez*, supra, the Ninth Appellate District held that a parent could not use the ADA as a ground to contest the granting of permanent custody of her children to the children-services agency because neither the ADA nor the related regulations provide that the violation of the ADA by a public entity may be used as a defense against a legal action by the public entity.  The court declined the parent's invitation to create a new means of enforcement that had not been adopted by Congress or included by the Attorney General in the regulations adopted to implement the ADA.  Id.

{¶41}   We are persuaded by the Ninth Appellate District's analysis, as well as that of other Ohio appellate districts that have addressed the issue, in holding that an alleged violation of the ADA by a public children-services agency may not be asserted

10

as a defense in a permanent-custody action brought by that agency. See *Moore*, *Harmon*, and *D.J.*, supra. And in light of Williams' concession that there were no further accommodations that could have been provided by HCJFS, we conclude that there was no violation of her rights under either act. Accordingly, we overrule the third assignment of error and affirm the trial court's judgment.

Judgment affirmed.

SUNDERMANN, **P.J.**, and CUNNINGHAM, **J.**, concur.

Please Note:

The court has recorded its own entry on the date of the release of this opinion.