[Cite as *In re A.S.*, 2026-Ohio-244.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.S.

Court of Appeals No.  L-25-00202
L-25-00203

Trial Court No.  JC 243000091

## DECISION AND JUDGMENT

Decided: January 28, 2026

* * * * *

Jana Waltz, for appellee.

Melody Wilhelm, for appellant father.

Laurel A. Kendall, for appellant mother.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, appellants, O.S. ("mother") and A.V. ("father"), appeal the August 18, 2025 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating their parental rights and granting permanent custody of their child, A.S. ("child"), to appellee, Lucas County Children Services ("LCCS").  For the following reasons, we affirm.

## I. Background and Facts

## A. Pretrial

{¶ 2} On May 22, 2024, LCCS filed a complaint alleging that child was dependent. The complaint claimed that the agency received a referral about child because mother had a significant history of mental health concerns, had lost custody of another child because of her mental health issues, was not engaged in any mental health treatment, was under investigation by adult protective services for killing a woman, and had a history of perpetrating domestic violence against the father of her older child. Mother was ordered to complete parenting and mental health services in the court case involving her older child, but she failed to do so over an 18-month period. Additionally, mother had a history with a Pennsylvania children services agency. The caseworker in that case said that he had concerns about mother's mental health and violent behavior. Further, mother was reportedly violent with her ex-husband, father, and father's mother, with the last incident happening approximately six weeks before LCCS filed the complaint. When the caseworker in this case discussed the referral with mother, mother said that her mental health was stable, she was not engaged in any mental health services, and she did not try to hurt her older child.

{¶ 3} At the shelter care hearing, the trial court granted LCCS interim temporary custody of child.

{¶ 4} At the adjudication and disposition hearing, mother and father agreed to a dependency finding. The magistrate found that child was dependent, and the trial court adopted the magistrate's decision.

{¶ 5} Following the adjudication and disposition hearing, Audrey Sweeney, child's guardian ad litem, asked the magistrate at a review hearing to appoint guardians ad litem for mother and father "to assess their abilities and their mental capacity and their ability to understand what is going on in this case." She based her request on information she had learned since the adjudication and disposition hearing but did not specify on the record what that information was. Neither LCCS's nor the parents' attorneys objected to Sweeney's motion, and the magistrate granted the motion. The trial court adopted the magistrate's decision.

{¶ 6} In March 2025, LCCS moved for permanent custody of child. In its motion, the agency alleged that child was removed from mother's care because of concerns about mother's mental health and mother's prior involvement with child welfare agencies.

{¶ 7} Regarding mother, LCCS offered her case plan services including a dual-diagnostic assessment, parenting, and domestic violence batterers services. She completed her assessment, which recommended therapy, anger management, and medication management. She was engaged in therapy and medication management and had completed three of 13 anger management classes. Mother had not been referred to parenting or domestic violence services because of lack of progress with her mental health services.

3.

{¶ 8} As to father, his case plan services included a dual-diagnostic assessment. He completed the assessment, which recommended therapy and anger management. Father attended three therapy sessions, the last of which was in November 2024. Father had recently resumed visits with child.

{¶ 9} LCCS had not identified any appropriate relatives to place child with.

{¶ 10} The agency asked the court to award it permanent custody because (1) mother and father failed to complete case plan services to remedy the issues causing child to be placed outside of the home, (2) mother had a long history of mental health concerns that remained, (3) there were concerns about mother's cognitive ability and her ability to independently parent child, (4) father failed to consistently visit child, (5) father abandoned child, (6) child was doing well in foster care, and (7) child needed a legally secure, permanent placement.

{¶ 11} After the agency filed its motion but before the permanent-custody hearing, Robin Fuller, father's GAL, filed a motion for a psychiatric or psychological assessment of father because she believed that it would be in father's best interest. She did not provide any specifics about why she believed it would be in father's best interest but did say that father "agrees to this assessment and feels it is necessary as well. [Father] further stated he understands what his rights are and states he is aware of what LCCS is asking for in its permanent custody motion." LCCS objected to the motion because father had completed a dual-diagnostic assessment that did not recommend further psychiatric testing or diagnose him with anything indicating a need for further testing.

4.

Beyond that, Fuller did not provide a "meaningful reason" for requesting the testing or claim that an evaluation would assist father in remedying the issues LCCS had identified with his ability to independently parent.

{¶ 12} The trial court denied Fuller's motion because father was scheduled for a second dual-diagnostic assessment, and if the assessor thought that further testing was necessary, they would include that recommendation in their report. In that case, the court would reconsider the motion.

## B. Permanent custody hearing

{¶ 13} At the permanent custody hearing, LCCS presented the testimony of LCCS caseworker, Andrew English, and child's GAL, Sweeney. Mother and father each testified in their own behalf.

### 1. LCCS's case

{¶ 14} English, the family's ongoing caseworker, testified that LCCS became involved with the family at child's birth when it received a call alleging concerns about mother's mental health issues and, given her loss of custody in other counties, concerns about her ability to appropriately parent child. In response, the agency filed a dependency complaint. At the time, the agency's concerns included mother's "history of aggression" because "she had previous 911 reports alleging her aggression[,]" her mental health, and her ability to care and provide for child.

{¶ 15} In the family's case plan, a dual-diagnostic assessment, parenting classes, and domestic violence services were identified for mother. In August 2024, mother

completed the assessment, which recommended counseling, case management, anger management, and medication management. She was diagnosed with borderline personality disorder, PTSD, anxiety and depression. At first, mother did not consistently participate in counseling, anger management, or medication management; although she was referred for services in August 2024, the mental health agency did not mark her as compliant and making progress until May, June, and July of 2025. It concerned English that mother took more than nine months to become consistent with her mental health services. The most recent update English had from the service provider was that mother had completed anger management a few weeks before the permanent custody hearing and was compliant with counseling and medication management.

{¶ 16} Despite that, LCCS still had concerns about mother's mental health. English believed that it contributed toward mother's aggression, and he noted that "[t]here were incidents of 911 and police involvement in the last six months." In one particular incident, father called 911 because mother was chasing him with a knife and threatening to hurt him. Mother was arrested and charged with domestic violence and assault, but the charges were later dropped at father's request. There were not any incidents that English knew of in the three to four weeks before the hearing.

{¶ 17} Mother has a history of domestic violence in her relationship with her ex-husband, with her sister, and in her foster placement when she was growing up. Mother and father reported "past instances where they get into arguments to the point of at least

6.

raising their voices[,]" which "raises [the agency's] concern for domestic violence around them."

{¶ 18} Mother was never referred to domestic violence services because LCCS wanted her to finish anger management first. Similarly, it did not refer her to parenting classes because it "wanted to make sure that she had her mental health fully addressed" before doing so. "Fully addressed" would mean that mother was "stable for a significant period of time and [could] show her stability." The agency also had concerns about whether mother "has the capacity to gain from that parenting [class] and whether or not that will fully address her ability to parent a child." Reports from mother's mental health providers mention their belief that mother has a cognitive delay, but she had never been diagnosed with one. English and prior caseworkers also thought that mother was "not at full mental capacity. And then due to those delays she would struggle to live independently or struggle to parent the child independently."

{¶ 19} There were also concerns about mother being able to care for herself, given her mental health challenges. English was concerned that mother had told him that she cannot live on her own because of memory issues, medical conditions, and her mental health. That is, mother said that she must live with someone else "to help her." One of the problems mother noted was trouble remembering to take her medicine when she had memory issues.

{¶ 20} Mother has an older child who is in the legal custody of a grandparent. The older child ended up with the grandparent after an allegation that mother tried to smother

7.

it while she was feeding it. Mother told English that she lost custody "due to the child being cold because she fed the child cold milk and then tried to warm that child. And then . . . someone thought she was smothering the child." When English asked about that situation, mother "blamed the hospital saying that the hospital didn't teach her or tell her that the child couldn't have cold milk, or she just wasn't taught how to warm a child or address those concerns." The court in that case asked mother to complete a mental health assessment and parenting classes, but mother did not. Mother did not have any contact with her older child because the child was afraid of her.

{¶ 21} At the time of the hearing, mother was pregnant with a third child. Either father or a man named Jason, whom mother identified as her fiancé, was the father of the baby. LCCS had concerns about Jason. Mother and father lived with Jason, who had some mental health issues. Both reported Jason's "outbursts and aggressions." Jason would not meet with English when he went to the home. While English was there, he heard mother and Jason arguing about whether he would meet with English or engage with the agency. Mother told English that Jason "could be appropriate even though she was telling [English] about his aggression and his mental health concerns, but that he wasn't willing to be involved with the case or he wasn't willing to be involved with her child."

{¶ 22} Mother did not have independent, stable housing at the time of the hearing. She was living with father and Jason in an apartment leased by Jason. As far as English knew, they were several months behind on rent, and their landlord was refusing to fix

8.

their broken air conditioner because of that. Nor did mother have a car because someone had totaled their car and they were "working on the finances to repair that car. And they were still dependent on Jason for assistance with financing that." English had concerns about the cleanliness of the home and the number of animals in the home but said that there were "no direct visible hazards to the structure." He did not see any provisions specifically for child, not all of the utilities were working, and the parents reported financial strain, but English did see food in the home.

{¶ 23} For father, the agency recommended a dual-diagnostic assessment. It also discussed parenting and domestic violence or anger management services, but those were never added to the case plan for him. As it had with mother, LCCS wanted father to address his mental health issues before he attended any other services. Additionally, father was previously referred to those services, but he left the state, which led to the agency removing him from the case plan. Once he was put back on the case plan, it "took a while to even start his mental health services." His assessment diagnosed him with PTSD and recommended therapy and medication management. Father did his first assessment in October 2024. He went to two therapy sessions between then and December 2024. He did not engage in any mental health treatment between December 2024 and his second dual-diagnostic assessment in June 2025. He attended two therapy sessions after his second assessment. Although father was not formally diagnosed with any cognitive delays, the assessor who completed his second assessment noted that father

9.

was "'observed to have some cognitive and speech impairment which did affect his ability to complete [the] dual assessment.'"

{¶ 24} LCCS did not refer father for any additional services, despite father's request for referrals, because he "had just started engaging with his mental health services and this pending trial."

{¶ 25} At the time of trial, LCCS had ongoing concerns about father's mental health. Specifically, "with that diagnosis of PTSD and those cognitive delays [it had] concerns that he would not be able to successfully parent independently given his mental health and his delays." There were also concerns about the "large outbursts and arguments" mother, father, and Jason would have. Additionally, father did not have independent housing; he was living with mother and Jason. He also lacked stable employment.

{¶ 26} English did not think that father could independently parent child because of his cognitive abilities, his "instability when it comes to housing and his ability to provide for his child[,]" his issues with anger management, and English's "concerns that given [father's] mental health and cognitive abilities that anger management [classes] might not be helpful for him."

{¶ 27} Regarding child, English said that she had been in the same foster home since birth. She was doing "very well" there. She was developmentally on target, well bonded with her foster parents and sibling, growing, and overall doing well. The foster parents were willing to adopt her.

10.

{¶ 28} Mother had supervised visits with child twice a week. There were no concerns noted with mother's visits. English observed one of those visits and found mother's interactions with child to be appropriate. Father had supervised visits with child once a week. From December 2024 to March 2025, father did not visit child at all. When he resumed visits in March 2025, he was "missing visits on and off," but he had been consistent with his visits after "a one-hour call ahead" was added to his visits. There were no concerns noted with father's visits. English observed father during his visits, and father was appropriate with child.

{¶ 29} LCCS was requesting termination of mother's and father's parental rights and an award of permanent custody to the agency. English thought that permanent custody was in child's best interest because he believed that "neither parent can parent their child independently." Mother and father were both living with and financially dependent on Jason, but "the three of them together would not be safe and appropriate." Additionally, mother had told him that she cannot live independently, and if she cannot live on her own, he did not believe that she could parent independently. The concerns for mother's parenting and father's cognitive ability, mental health, and anger in his relationship with mother that existed at the beginning of the case still existed at the time of trial. English did not think that the parents would be able to complete their case plan services if they were given more time because of their mental health and cognitive abilities.

11.

{¶ 30} On cross-examination, English testified that child was not placed with father because of concerns about his living arrangements, mental health, and cognitive abilities, and because father left the state shortly after being added to the case plan. Father had become consistent with his therapy and medication management in the month prior to the permanent custody hearing. He asked for referrals to services that LCCS did not provide. Even if LCCS had referred father to additional services, English doubted that father would have made enough progress to reunify with child, considering "his capacities and his behaviors up to this point."

{¶ 31} Obtaining independent housing and continuing to engage in mental health treatment would have helped father reunify with child. Father was looking for a job when English visited him in the month before the permanent custody hearing.

{¶ 32} Although the agency where father completed his second assessment noted that his cognitive and speech impairments caused some problems with him completing the assessment, father was able to complete the assessment. Father was diagnosed with PTSD and generalized anxiety disorder. Those presented in "his interactions with other people that he's living with and his—even some aggression that he has shown [and] it seems to [English] that he would not be able to control himself or provide for his child."

{¶ 33} LCCS had not done any observations of father parenting child because those observations are usually done during parenting classes.

{¶ 34} English confirmed that mother had been compliant with her mental health treatment for the 90 days before the final hearing and had completed her anger

12.

management class a few weeks before the hearing. Despite that, she was not referred for domestic violence or parenting classes because the final hearing was only a couple of weeks away. Additionally, mother was charged with domestic violence in April 2025 for threatening father with a knife. This indicated to English that mother was not gaining anything from her anger management classes.

{¶ 35} Although the agency had some concerns about mother's mental capacity, she had not had a psychological evaluation, so it did not know what her cognitive abilities really were.

{¶ 36} Mother regularly visited with child twice a week throughout this case and there were no safety concerns with mother's visits. She asked for additional visitation time that the agency did not grant.

{¶ 37} Mother and father were residing together but said that they did not intend to live together long-term. However, they had not asked for resources to help with their housing issues.

{¶ 38} In her testimony, Sweeney, child's GAL, said that she had conducted a thorough investigation and visited with child frequently while this case was pending. Based on her observations, she had concerns about mother independently parenting child. Specifically, she was concerned about domestic violence in the home. Neither parent denied the domestic violence or their need for services, and both acknowledged that they were not progressing with their services. Sweeney was also concerned that both parents

13.

had only recently engaged in mental health treatment and they still needed to complete other services, like parenting and domestic violence classes.

{¶ 39} Sweeney also thought that mother and father's home was not suitable for a child for several reasons. Sweeney had concerns with the home's cleanliness. There were three dogs in the home, which caused "an animal smell in the home that was extremely bad." Although mother had some things for child at the home, "there wasn't really a place for the child to go." And there was "constant domestic violence" in the home.

{¶ 40} Sweeney was also troubled by the allegation that mother had tried to smother her older child. She acknowledged that mother denied the allegation and noted that mother initially told her a different story about the incident than she did in her testimony. Mother had explained the incident by saying that "she had given the child cold milk. The child was cold and she was trying to warm the child. Nothing about breastfeeding and being left on the chest."

{¶ 41} Finally, Sweeney was concerned about violence because mother was under investigation by adult protective services and was "possibly identified as the person that could have participated in the homicide of an individual . . . ."

{¶ 42} Sweeney did not think that giving the parents more time to complete services would enable them to reunify with child because

> [t]hey've had a year up to this point and I've got mom just engaging in counseling and I've got dad who is just now getting lined up with counseling. You've still got domestic violence, you've still got parenting, you've still got housing. Basically all the concerns that opened this case

14.

are still here.  I've got parents that aren't properly taking medication. Whether they can get it or not or afford it or not they're both testifying today that they've had lapses in their medication and not able to get it, but then both testifying and stating to me, too, that that medication is crucial to them not to have anger outbursts and be able to control themselves.  I can't put [child] back into that.  That's not stable, and that's not safe for her.

Sweeney said that child was doing well and seemed happy in her foster placement. All of her needs were being met, and she was bonded with her foster parents and foster sibling.  Her foster parents were willing to adopt her.

{¶ 43} Sweeney recommended that LCCS be awarded permanent custody of child. She believed that would be in child's best interest.

{¶ 44} On cross-examination, Sweeney testified that mother could change her recommendation if she "show[ed] a commitment to change, change of behavior. . . . she needs to show a commitment to change as in not living with dad, not living with Jason, having her own independent housing."  When mother's attorney asked if "things have been improving lately[,]" Sweeney replied that mother "has tried in a sense."

{¶ 45} Regarding father, Sweeney said he could change her recommendation if he "show[ed] a commitment to change. . . .  [T]here is no change in behavior without a behavior change difference, therapy, counseling, consistent medication, housing, staying away from his abuser who is mom. . . .  That's not yet been demonstrated in over a year."

### 2. Mother's testimony

{¶ 46} Mother testified that she had been living with Jason for about three months, but she planned to get independent housing.  She had "an application for Metro" and was looking for a two-bedroom home.  Mother did not think that her living situation was a

15.

concern because Jason was hard of hearing, so she had to use a loud voice when she was speaking to him, and she and father were looking for other places to live.

{¶ 47} Mother was receiving mental health services, including therapy and medication appointments. She had been attending appointments for the past three months. She was taking medications and said that she "noticed less of an impulse issue that [she was] having and less anger issues." She completed anger management classes a few weeks before the permanent custody hearing. She asked "multiple times" to be referred to other services, but LCCS did not give her the referrals.

{¶ 48} Regarding the domestic violence incidents that happened in March and April 2025, mother explained, "I was charged with domestic violence because I was in the fear of safety for my unborn child because [father] would not let me leave the house, and he was shoving and getting in my face and screaming at me." Mother pleaded to the charges from the March incident and was placed on probation, and the charges from the April incident were dropped.

{¶ 49} Mother was visiting with child, and the visits were going "pretty good." Child would get upset at the end of visits, but mother would find ways to soothe her.

{¶ 50} Mother thought that being in her home was in child's best interest. She explained, "I do believe I deserve a second chance. Because I was not given the full chance with my first kid because I got married to the wrong family. And not just that, I didn't have the best support at the time." Mother wanted the trial court to know that "I actually don't neglect my kids. I nurture them, I bathe them, I feed them proper meals. I

teach them right from wrong.  I don't sit there and push them aside.  I make sure that they have everything.  I am willing to be broke to make sure that my kids have everything.  I am willing to put them first over myself."

{¶ 51} On cross, mother explained that her ex-mother-in-law has custody of her older child.  She claimed that the incident that led to the older child's grandmother getting custody was blown out of proportion.  She said that she was breastfeeding the child and the child was breathing.  Mother was not visiting with the older child and had a no-contact order with the grandmother because of arguments she had had with the grandmother.

{¶ 52} Mother admitted that she did not start attending mental health appointments regularly until May 2025, despite receiving her referral to those services in July 2024.  She had attended three appointments as of the permanent custody hearing, and had completed her anger management class.

{¶ 53} Mother denied any ongoing domestic violence issues between her and father.  She claimed, "[w]e haven't had any physical contact towards ourselves for the past two months that we've been living in the same home.  We do have loud arguments, but that's because we're trying to figure out what's best for [child] and trying to figure out how to get an apartment, how to get a car.  We're trying to figure everything out."  Mother admitted that she punched father in the face in both March and April, she was charged after both incidents, and father was not charged after either incident.  The April charges were dismissed because father did not want to prosecute them.

17.

**{¶ 54}** She and father were no longer in a romantic relationship; they were only coparenting. Mother believed that their relationship had been safe and healthy for the past month and a half.

**{¶ 55}** Although mother admitted to English that her relationship with Jason was not healthy, she believed that the environment would be safe for child if Jason went into counseling. He was not yet engaged in counseling, but they were "working on getting him into that."

**{¶ 56}** Mother was living with Jason and father. Jason was the only person on the lease for the home where they were living. She claimed to be working on getting her own home but had not yet turned in her housing application. She thought that it would take "a couple of months" for her to get her own place. She was "basically" living independently in Jason's home because she was cleaning, cooking, taking out the trash, and taking care of the dog. When she has memory problems, she writes things down on a calendar and sets alarms for her medicine.

### 3. Father's testimony

**{¶ 57}** Father testified that his case plan services initially included a dual-diagnostic assessment and anger management, but anger management was removed a few weeks after it was recommended. He asked LCCS for anger management, parenting classes, and more visits with child, but the agency did not provide any of those services. Someone told father that he was going to move forward with services and then soon after, he was told that he was "not being moved forward because of this trial."

18.

{¶ 58} Father did a dual-diagnostic assessment and started mental health services at an agency in Hancock County, but he stopped when he moved out of state for several months. He initially left because of a family emergency and was unable to return to Ohio because the person who was going to give him a ride did not pick him up. Eventually, mother and Jason picked him up and brought him back to Ohio. When he came back to Ohio, it took LCCS almost a month to get him back on the case plan.

{¶ 59} In the month before the hearing, father completed a second dual-diagnostic assessment. He had a therapy appointment and a medication management appointment scheduled. He was consistently taking his medications when he had them. He had not taken his medications for about a month as of the trial date.

{¶ 60} Father did not have a car but expected to within a week. He planned to jointly purchase one with Jason.

{¶ 61} Father was living with mother and Jason but was looking for places to live on his own. He did not plan on living with mother unless she needed his help. He initially moved in with mother and Jason because his former landlord did not fix safety issues in his apartment, like broken glass and wiring issues, or install a stove and refrigerator.

{¶ 62} Regarding the domestic violence incidents, father said that he was the victim. He thought that mother believed that he was the aggressor because "when [he] tried to talk to her, she . . . didn't open up at that time. . . . So she wasn't really communicating with [him]." He was also concerned for mother's safety.

19.

{¶ 63} Father was visiting child regularly. He said that visits were going "pretty good" and child was "a happy, wonderful girl when she sees daddy." He and child were well bonded.

{¶ 64} Father thought that he would be able to take care of child if he had custody of her because his disability income would cover both him and child. He also told the court, "I know I can take care of my daughter. I do have support as family and friends standing behind me and that would help me every step of the way if I need it."

{¶ 65} On cross, father explained that he did his first mental health assessment in October 2024. He completed four appointments before he left the state. He was unsuccessfully discharged by his first provider in January 2025. While he was out of state, he received medication management services from his primary care doctor. After he returned to Ohio, he received a referral to a new mental health service provider in April 2025, but they were booked until June 2025.

{¶ 66} While father was out of state, he texted child's foster mother every other day to check in. He requested a virtual visit with child, but the former caseworker never responded to him.

{¶ 67} Father was living with mother and Jason. Father's name was not on the lease, but Jason was in the process of talking to the landlord about adding father to the lease.

{¶ 68} Father agreed that there was conflict in the home. He said that they "do get in arguments, but it's no[t] physical." He downplayed the physical violence between him

20.

and mother in March and April 2025 and said that they were addressing the domestic violence by "communicating more better."

{¶ 69} Father did not have any concerns about mother parenting child on her own. He believed that mother could live on her own and would only need help "once in a blue moon." He also believed that mother "handles her anger just fine" and that mother's violent behavior was in the past.

{¶ 70} Father claimed that he was taking his medicine, despite not having his refills. He said the same about mother. He also pointed out that mother had been out of medicine for a week and "hasn't had one [angry] outburst."

{¶ 71} Father understood that he would have to progress with his case plan services to be offered additional services.

## C. Trial court's decision

{¶ 72} At the hearing to announce its decision, the trial court said that "the parents love their daughter and do want what's best for her, however, their actions do not reflect that . . . ." It found that the parents' "unwillingness to complete or participate in services and an inability to acknowledge some of the problems that brought them here leaves the Court with no option but to grant the Agency permanent custody at this time." It noted that both parents requested additional services from LCCS, but "they weren't even participating in the one that they were initially requested to do in order to move on to further services so that is concerning to the Court."

21.

{¶ 73} The court found that R.C. 2151.414(E)(1) and (2) applied to mother and (E)(1) and (4) applied to father. It also found that granting permanent custody to the agency was in child's best interest and that LCCS had "complied with reasonable efforts."

{¶ 74} In its judgment entry, the trial court found clear and convincing evidence that child could not be placed with the parents within a reasonable time and should not be placed with the parents and that awarding permanent custody to LCCS was in child's best interest.

{¶ 75} The court found under R.C. 2151.414(B)(1)(a) that child could not be placed with either parent within a reasonable time and should not be placed with either parent.

{¶ 76} In determining that child could not or should not be placed with mother, the court made findings under R.C. 2151.414(E)(1) and (2). In determining that child could not or should not be placed with father, the court made findings under R.C. 2151.414(E)(1) and (4).

{¶ 77} As to (E)(1), the court found that mother and father continuously and repeatedly failed to substantially remedy the conditions that caused child to be placed outside of the home, despite reasonable case planning and diligent efforts by LCCS. The court found that mother and father failed to "meaningfully engage in or complete" case plan services. Mother had only been consistent with her mental health services for approximately three months and there were concerns that she was not consistently taking

22.

her medication; although she had completed anger management classes, she continued to have issues with anger and domestic violence; and she had not been referred for parenting classes because of her lack of progress with other services. Father had only recently engaged in mental health services and admitted that he was not taking his medication as prescribed and he admitted to a need for anger management, although he had not been referred to that service. Both parents minimized the conflict with the other and within their home. English and Sweeney each testified that they did not believe the parents would make enough progress to reunify with child even if they were given additional time to complete case plan services. Sweeney explained that the parents had more than a year to engage in services but had only done so recently, and that all of the concerns that existed when the case began still existed at the time of the hearing. Therefore, child would not be safe or stable.

{¶ 78} As to (E)(2), the court found that mother suffered from such severe chronic mental illness that she was unable to provide an adequate permanent home for child at the present time and it was "highly unlikely" that she would be able to remedy her chronic mental illness within one year after the permanent custody hearing. Mother had a history of mental health concerns, including diagnoses of borderline personality disorder, PTSD, anxiety, depression, and possibly schizophrenia. She was referred to mental health services in an earlier case in Hancock County but failed to engage in those services. She was again referred to mental health services in this case and had "failed to consistently engage in services until recently."

23.

{¶ 79} As to (E)(4), the court found that father demonstrated a lack of commitment toward child by failing to regularly support, visit, or communicate with child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for child. Father failed to visit child consistently throughout the case. Specifically, father did not have contact with child from December 2024 through March 2025. Father also failed to meaningfully engage in case plan services and significantly delayed engaging in services. Additionally, father "fails to recognize his toxic home environment and minimizes the agency's concern for domestic violence within this environment."

{¶ 80} Based on these factors, the court determined that LCCS presented clear and convincing evidence that child had not been abandoned or orphaned, had not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and could not be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 81} Finally, the court determined under R.C. 2151.414(D)(1) that it was in child's best interest to award LCCS permanent custody. Specifically, the court found under R.C. 2151.414(D)(1)(a) that child was bonded with the caregivers and other child in her foster home, she was doing well and all of her needs were being met, and Sweeney, her GAL, believed that it was in her best interest that LCCS receive permanent custody. It found under (D)(1)(b) that child was too young to make her wishes known, but Sweeney said that she seemed happy in her foster home. Under (D)(1)(c), the court

24.

found that child had been in foster care for her entire life (approximately 14 months at the time of trial). It found under (D)(1)(d) that the agency could not find any appropriate relative placements and child's foster family was willing to adopt her. And it found under (D)(1)(e) that none of the factors in R.C. 2151.414(E)(7) to (11) applied.

{¶ 82} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of child to LCCS and terminated mother's and father's parental rights.

{¶ 83} Mother now appeals, raising three assignments of error:

> I. The trial court committed plain error by failing to find, by clear and convincing evidence at a hearing, that it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(B)(l)(a)-(e).

> II. The trial court's finding pursuant to R.C. 2151.414(E)(l) that mother failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home was not supported by clear and convincing evidence.

> III. The trial court's finding pursuant to R.C. 2151.414(E)(2) that chronic mental illness, chronic emotional illness or intellectual disability of mother is so severe that it makes mother unable to provide an adequate permanent home for the children at the present time and, as anticipated, within one year after the court holds the hearing was not supported by clear and convincing evidence.

Father also appeals, raising two assignments of error:

> I. The trial court abused its discretion in denying the motion for psychiatric and/or psychological assessment, filed by Father's Guardian ad litem

> II. Trial counsel provided ineffective assistance because he did not seek a continuance of the hearing in order for Father to undergo a psychological examination

25.

## II. Law and Analysis

### A. Father's assignments of error

### 1. The trial court did not abuse its discretion by denying father's request for a cognitive assessment.

{¶ 84} In his first assignment of error, father argues that the trial court abused its discretion by denying his request for a psychological or psychiatric assessment to determine his level of cognitive functioning. He points out that both Sweeney and Fuller raised concerns about his capacity to understand and participate in the proceedings, but the trial court refused to permit an examination of his mental capacity. He contends that this was an abuse of discretion because there is nothing in the record showing that the dual-diagnostic assessment that he underwent was an acceptable substitute for a cognitive assessment, there is no indication that anyone spoke to the assessor to confirm that further cognitive testing was unwarranted, and permitting the examination would not have negatively impacted the timing of the case.

{¶ 85} LCCS responds that the trial court did not abuse its discretion by denying Fuller's motion. It points out that the court denied the motion because father was scheduled to undergo a dual-diagnostic assessment, which had the potential to resolve the question of father's mental capacity. The court also said that it would reconsider the motion if the assessor thought any further cognitive testing was necessary, but there is nothing in the record indicating that more testing was necessary or that anyone asked to renew the motion for a cognitive assessment. The agency also points out that father's cognitive capacity was not the basis for its permanent-custody motion and that its

26.

concerns from the beginning of the case remained.

{¶ 86} Under Juv.R. 32(A), the juvenile court

> may order and utilize a social history or physical or mental examination at any time after the filing of a complaint . . . [u]pon the request of the party concerning whom the history or examination is to be made; . . . [w]here a material allegation of a neglect, dependency, or abused child complaint relates to matters that a history or examination may clarify; [or w]here a . . . party's competence to participate in the proceedings is an issue. . . ."

Juv.R. 32(A)(1), (3), (4). The rule "states that a court 'may' order an examination, placing the decision within the court's discretion." *In re D.T.L.M.*, 2015-Ohio-1762, ¶ 19 (12th Dist.). Therefore, we review the juvenile court's decision regarding an examination under Juv.R. 32 for an abuse of discretion. Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996). Additionally, "[d]ue process requires the appointment of a psychiatric expert in permanent-custody proceedings where a parent's mental or emotional health is the predominant and determinative issue. . . . But where a parent's mental health is not at issue, psychiatric expertise would contribute little to the proceedings and is not required." *In re C.W.*, 2011-Ohio-4756, ¶ 32 (1st Dist.), citing *In re Brown*, 1986 WL 13385 (1st Dist. Nov. 26, 1986); and *In re Shaeffer Children*, 85 Ohio App.3d 683 (3d Dist. 1993).

{¶ 87} In this case, the trial court did not abuse its discretion by denying father's request for a psychiatric or psychological evaluation. Although child's GAL raised some initial concerns about father's ability to understand the proceedings, when Fuller, father's GAL, formally requested the evaluations, she did not provide any reasons for needing the

evaluations beyond the evaluations generally being in father's best interest. She did not allege that father was incapable of understanding the proceedings and, in fact, told the court that father "understands what his rights are and states he is aware of what LCCS is asking for in its permanent custody motion." Moreover, the court left open the possibility of reconsidering its decision if the person doing father's dual-diagnostic assessment believed that further assessment was necessary, but no one renewed the motion for the evaluations or asked the court to reconsider its decision.

{¶ 88} Importantly, father's mental capacity was not a predominant and determinative issue in the case. The basis for LCCS's permanent custody motion as to father was his failure to complete case plan services and his failure to visit child. The evidence at the hearing showed that father delayed engaging in his mental health services, did not address the domestic violence between him and mother, and did not have contact with child for several months when he was able to. In other words, LCCS was not alleging that father was an unfit parent because of his intellectual functioning. Under these circumstances, we cannot say that the trial court's ruling was an abuse of discretion or that due process required the trial court to grant father's motion. Father's first assignment of error is not well-taken.

### 2. Father did not receive ineffective assistance of counsel.

{¶ 89} In his second assignment of error, father argues that his trial counsel was ineffective because counsel failed to request a continuance so that father could undergo a psychological or psychiatric examination. He contends that counsel had an "essential

28.

duty" to request a continuance for an evaluation because Fuller requested the evaluation, Sweeney and Fuller each expressed concern about father's mental capacity, and there is no evidence in the record that a dual-diagnostic assessment considers factors related to a person's mental capacity. LCCS responds that a continuance was unnecessary because the issue of father's competency examination was resolved before trial when the dual-diagnostic assessor determined that he did not have any cognitive delays and father's GAL did not renew the motion for an evaluation. Further, it argues that if counsel had requested a continuance, it is likely that the trial court would have denied the motion because the court had already ruled that it would reconsider Fuller's motion if the assessor recommended further assessments, but the assessor did not do so.

{¶ 90} The standard for a claim of ineffective assistance of counsel is the same in a juvenile court proceeding as it is in a criminal proceeding. *C.L. v. S.M.*, 2018-Ohio-5281, ¶ 41 (6th Dist.), citing *Jones v. Lucas Cty. Children Servs. Bd.*, 46 Ohio App.3d 85, 86 (6th Dist. 1988). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984); and *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. A reasonable probability is one sufficient to undermine confidence in the outcome. *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002). Failure to present sufficient evidence on either

29.

prong is fatal to an ineffective-assistance claim. *State v. Leasure*, 2023-Ohio-2710, ¶ 40 (6th Dist.), citing *Strickland* at 697.

{¶ 91} To prevail on an ineffective-assistance claim, the appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland* at 686. Properly licensed Ohio lawyers are presumed to be competent, and there are "countless" ways for an attorney to provide effective assistance in a case. *State v. Gondor*, 2006-Ohio-6679, ¶ 62; *Bradley* at 142. Thus, "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *Bradley* at 142, quoting *Strickland* at 689.

{¶ 92} Here, there is nothing in the record that supports a finding that father's trial counsel was ineffective. The trial court properly denied father's request for a psychological or psychiatric evaluation, so there was no reason for trial counsel to request a continuance for father to undergo an evaluation that the court had already denied. *See State v. Kochensparger*, 2016-Ohio-2870, ¶ 27 (6th Dist.) ("Counsel is not required to do a futile act."). Because counsel's failure to request a continuance was not unreasonable, father has failed to show that he received ineffective assistance of counsel. Therefore, father's second assignment of error is not well-taken.

## B. Mother's assignments of error

### 1. The law of permanent custody

{¶ 93} Revised Code 2151.414 provides the analysis that a trial court must undertake when considering whether to terminate parental rights and vest permanent

30.

custody in a children services agency. Under that section, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a) through (e) exists. As applicable here, subsection (a) requires the court to find that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 94} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest and whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.*, 2010-Ohio-3329, ¶ 42-43 (6th Dist.).

{¶ 95} As relevant here, the court found that R.C. 2151.414(E)(1) and (2) were applicable to mother. The statute provides:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent

31.

home for the child at the present time and, as anticipated, within one year after the court holds the [permanent custody] hearing . . . [.]

R.C. 2151.414(E). The court's finding that *any* (E) factor exists is sufficient to support an award of permanent custody to the agency. *In re S.J.*, 2024-Ohio-5137, ¶ 29 (6th Dist.); *In re Carlos R.*, 2007-Ohio-6358, ¶ 38 (6th Dist.) ("[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent . . . .").

{¶ 96} After finding that at least one factor in R.C. 2151.414(E) applies, the court must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 97} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. *In re J.S.*, 2025-Ohio-17, ¶ 34 (6th Dist.). "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 2004-Ohio-896, ¶ 14 (6th Dist.).

{¶ 98} The Ohio Supreme Court has clarified the standard of review in permanent custody cases:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.*, 2023-Ohio-4703, ¶ 11. Notably, the court rejected abuse-of-discretion review

32.

in these cases. *Id.* at ¶ 18.

{¶ 99} "The sufficiency of the evidence [standard] tests the adequacy of the evidence: a court of appeals should affirm a trial court when the evidence, if believed, is legally sufficient to support the verdict as a matter of law." *In re C.W.*, 2025-Ohio-282, ¶ 37 (10th Dist.), citing *Z.C.* at ¶ 13.

{¶ 100} In a manifest weight review, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.*, 2012-Ohio-3556, ¶ 20 (6th Dist.). If the evidence is susceptible to more than one interpretation, we are bound to interpret it in a way that is consistent with the trial court's judgment. *Z.C.* at ¶ 14, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984). The trial court's determination that an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re C.P.*, 2009-Ohio-2760, ¶ 10 (10th Dist.). Therefore, we will not find a permanent custody decision against the weight of the evidence if it is supported by some competent, credible evidence in the record upon

33.

which the trial court could have formed a firm belief as to all of the essential permanent custody findings. *In re I.H.*, 2020-Ohio-4853, ¶ 34 (6th Dist.).

## 2. The trial court made the necessary R.C. 2151.414(B)(1) finding.

{¶ 101} In her first assignment of error, mother argues that the trial court committed plain error by failing to state on the record that one of the factors outlined in R.C. 2151.414(B)(1)(a) through (e) applies to child. LCCS responds that the trial court specifically held in its judgment entry that R.C. 2151.414(B)(1)(a) applies.

{¶ 102} "[A] court speaks only through its journal entries." *Infinite Sec. Solutions., LLC v. Karam Props., II, LLC*, 2015-Ohio-1101, ¶ 29. Thus, what the trial did—or did not—say at the hearing to announce its decision is immaterial. What matters is whether the court made the proper findings in its judgment entry. It did. The entry clearly states that

> this Court finds that LCCS has presented clear and convincing evidence that demonstrates that (1) that one or more of the conditions in R.C. 2151.414(B)(l)(a) through (e) applies . . . .
>
> . . .
>
> This Court finds that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent. . . .
>
> This Court's finds that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent because the following factors enumerated in R.C. 2151.414(E) are present . . .

{¶ 103} Because the trial court made the appropriate (B)(1) finding in its judgment entry, mother's first assignment of error is not well-taken.

34.

### 3. The trial court's R.C. 2151.414(E)(1) findings are supported by sufficient evidence and are not against the manifest weight of the evidence.

{¶ 104} In her second assignment of error, mother argues that the trial court's findings under R.C. 2151.414(E)(1) are not supported by clear and convincing evidence, so the trial court abused its discretion by granting permanent custody to LCCS. She contends that the court's decision was an abuse of discretion because she was attending therapy and compliant with her medication; she asked to be referred to additional services, but LCCS refused to give her the referrals; and she had time to complete domestic violence classes.

{¶ 105} LCCS responds that there is ample evidence to support the court's (E)(1) findings. It points out that mother had only been compliant with her mental health services for three months at the time of the hearing, she was not consistently taking her medication, and she continued to have angry outbursts after completing anger management classes. The agency also notes in response to mother's argument that there was time for her to complete more case plan services that "permanent custody law does not contemplate holding the child in custodial limbo for an extended period of time while a parent attempts to establish they can provide the child with a legally secure permanent placement."

{¶ 106} Although mother argues that the trial court abused its discretion, that is not the correct standard for evaluating a trial court's permanent custody decision. Instead, we must consider whether the court's findings are supported by sufficient clear and convincing evidence and are not against the manifest weight of the evidence. *Z.C.*,

35.

2023-Ohio-4703, at ¶ 11, 18.

{¶ 107} In this case, by the time of the hearing, the case had been open for over one year, but mother had only been compliant with her mental health treatment for approximately three months. She was not fully compliant because there was evidence that she was not consistently taking her medication, which is when she tended to have angry outbursts. Mother had completed anger management classes, but she admitted that she continued to have "loud arguments" with father, and she was charged with domestic violence for assaulting father twice while she was attending the anger management classes. English admitted that LCCS did not give mother referrals for any other services, but he explained that it did not refer her to domestic violence classes because it wanted her to complete anger management first or refer her to parenting classes because it wanted her to fully address her mental health first. Mother also admitted that she did not have a healthy relationship with Jason (whom she was living with) and that her home would be a safe environment for child if Jason went into counseling, which he was not currently engaged in. Taken together, these facts show that the trial court's conclusion under (E)(1) that mother continuously and repeatedly failed to substantially remedy the conditions that resulted in child's placement outside of the home is supported by sufficient evidence.

{¶ 108} Further, the trial court's (E)(1) findings are not against the manifest weight of the evidence. After weighing the evidence, the trial court found, by clear and convincing evidence, that LCCS met its burden of showing that mother continuously and

36.

repeatedly failed to substantially remedy the conditions that resulted in child's placement outside of the home. The trial court was in the best position to evaluate the evidence and testimony, and we are bound to construe evidence that is susceptible to more than one interpretation in a manner consistent with the trial court's decision. *Z.C.* at ¶ 14. The trial court's conclusion is supported by some competent, credible evidence, so it is not against the manifest weight of the evidence. Therefore, mother's second assignment of error is not well-taken.

### 4. Mother's third assignment of error is moot.

{¶ 109} In her third assignment of error, mother challenges the trial court's finding under R.C. 2151.414(E)(2). A trial court's finding that *one* (E) factor applies to a parent supports an award of permanent custody to a children services agency. *S.J.*, 2024-Ohio-5137, at ¶ 29 (6th Dist.); *Carlos R.*, 2007-Ohio-6358, at ¶ 38 (6th Dist.). Because we have determined that the trial court correctly found that (E)(1) applies to mother, her arguments about the court's other (E) finding is moot. *In re A.W.*, 2015-Ohio-407, ¶ 40 (6th Dist.); *In re A.H.*, 2020-Ohio-3102, ¶ 23 (1st Dist.). Therefore, mother's third assignment of error is not well-taken.

### III. Conclusion

{¶ 110} We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court did not abuse its discretion by denying father's request for an evaluation, father did not receive ineffective assistance of counsel, the trial court made the required R.C. 2151.414(B)(1) finding in its

37.

judgment entry, and the court's R.C. 2151.414(E)(1) finding as to mother is supported by clear and convincing evidence and is not against the manifest weight of the evidence. Mother's and father's assignments of error are without merit.

{¶ 111} Therefore, the August 18, 2025 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother and father are ordered to divide the costs of this appeal equally under App.R. 24.

Judgement affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| | |
|---|---|
| Thomas J. Osowik, P.J. | |
| | JUDGE |
| Christine E. Mayle, J. | |
| | JUDGE |
| Charles E. Sulek, J. | |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.