[Cite as *In re J.S.*, 2025-Ohio-17.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re J.S.

Court of Appeals No. L-24-1131

Trial Court No. JC23294247

**<u>DECISION AND JUDGMENT</u>**

Decided: January 2, 2025

* * * * *

Janna E. Waltz, for appellee.

Ashleigh Root-Morgan, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** The appellant, T.H. ("mother") appeals the May 21, 2024 judgment of the

Lucas County Court of Common Pleas, Juvenile Division terminating her parental rights

and granting permanent custody of J.S. to Lucas County Children Services ("LCCS"), the

appellee herein. For the following reasons, we affirm.

**I. Background**

**A. The Family's Involvement with LCCS**

**{¶ 2}** LCCS has worked with mother since 2010, when she was a juvenile and in

foster-care. The record in this case includes evidence establishing that LCCS was

awarded permanent custody of mother and that mother's case plan included services for mental health and substance abuse, probation compliance, and independent living services. (case No. JC10204346).

{¶ 3} Mother has four children, all of whom have been removed from her care, at different times. The juvenile court awarded legal custody of Child No. 1, born in 2013, to the child's maternal grandfather in early 2015. (case No. JC132366802). Later that same year, mother gave birth to Child 2, and legal custody of that child was awarded to a "free-home" in 2017. (case No. JC16255315). Mother's third child, J.S., who is the child at issue in this case, was born on December 22, 2017. (case No. JC17266402). Child 4 was born in 2024 and is the subject of a separate case with LCCS.

{¶ 4} J.S.'s father is Jas.S. ("father"). We address his involvement in this case below.

{¶ 5} On April 27, 2023, when J.S. was six-years old, LCCS filed a complaint in permanent custody, alleging that she was dependent and neglected. (LCCS case No. 23294247). In the complaint, LCCS alleged that J.S. was removed from mother's home in 2017, shortly after her birth, due to concerns for substance abuse, domestic violence, mental health and housing. J.S. was placed with her paternal grandmother, V.S. ("grandmother"). Mother and father were offered case planning services but failed to complete them, and legal custody was formally awarded to grandmother in 2019.

{¶ 6} The event triggering LCCS's reinvolvement, in April of 2023, was a referral from J.S.'s paternal aunt. According to the record, the aunt "brought [J.S.] to the agency

2.

stating that. . . grandmother was no longer able to care for [J.S.] due to her own medical needs [and] that there were no other relatives willing to care for [J.S.] or to step up to help." The aunt also reported that J.S. has behavioral issues and is not potty-trained. According to the complaint, "the parents have had no contact with [J.S.] in approximately 2 to 3 years."

{¶ 7} When J.S. was "brought" to LCCS, the agency reviewed records from the previous cases and spoke with mother. According to the caseworker, Kara Grabowski, the agency had the same "concerns" as before, i.e. that mother continued to struggle with her mental health, substance abuse, domestic violence, and housing. And, by then, mother had also failed to complete case planning in three prior cases (including when J.S. was removed in 2017). As for father, the complaint alleged that his whereabout were unknown, and that he had been charged with felony domestic violence and burglary in 2021. For all of these reasons, when the agency filed its complaint in dependency and neglect on April 27, 2023, it filed for "original permanent custody." Following a shelter care hearing, the juvenile court awarded LCCS interim temporary custody of J.S. and appointed Robin Fuller to serve as guardian ad litem ("GAL").

{¶ 8} An adjudicatory hearing was held on July 12, 2023. The purpose of an adjudicatory hearing is "to determine whether a child is * * * abused, neglected, or dependent or is otherwise within the jurisdiction of the court." Juv.R. 2(B). Mother attended the hearing and was represented by counsel. Mother stipulated to a finding of dependency but asked that the complaint be modified to note her disagreement as to some

3.

of the factual allegations. Pursuant to the parties' stipulation, the court found that J.S. was dependent and that father's whereabouts remained unknown.

{¶ 9} At a hearing later that month, LCCS moved to modify its request, from permanent custody to temporary custody with a goal of reunification with mother. LCCS modified its request because—in the intervening weeks since adjudication—mother had "agreed to case plan services." The parties stipulated that LCCS would take temporary custody of J.S. and that mother's case plan would include services for parenting, domestic violence, anger management, housing, and employment. The trial court adopted the case plan as an order of the court.

## B. A trial is held on LCCS's motion for permanent custody.

{¶ 10} On January 31, 2024, after six months of case-planning, LCCS reversed course and filed a motion for permanent custody of J.S. A trial on the agency's motion was held on May 8, 2024. At the outset, father's counsel requested to withdraw from the case, which the court granted, on the basis that father did not appear for trial and had not responded to counsel's communications for months. Because father did not appeal the trial court's judgment, we limit our discussion to the issues relative to mother.

{¶ 11} Two witnesses testified at trial: the LCCS ongoing caseworker, Kara Grabowski, and the guardian ad litem, Robin Fuller. A summary of their testimony is set forth below.

4.

**The caseworker**

{¶ 12} First, Grabowski testified about mother's history of case-planning. Grabowski confirmed that, in the case involving Child 1, mother was offered services for substance abuse, mental health, domestic violence (batterers and victims), and housing, and that mother did not complete her case plan. The agency had similar "concerns" in the case involving Child 2, and again, mother did not complete case planning. Mother and father were offered services in 2017, after J.S. was born, but neither completed case planning before grandmother was awarded legal custody.

{¶ 13} When the case was reopened in 2023, mother's case plan required her to complete a dual assessment to assess her mental health and substance abuse. She was also offered services for domestic violence and "potentially" a parenting class and housing.

{¶ 14} Mother completed a dual assessment in October of 2023 at Ohio Guidestone but "without a referral" from LCCS, meaning that it was based solely upon mother's "self-report[ing]" and without any input or records from LCCS. Grabowski testified that she "made it clear" to mother that she "needed to know where [mother] wanted to go and have a release signed prior to the appointment." Although the two had "talked about. . . going," mother never confirmed with Grabowski "when or if she was actually going to [go]" and did not make Grabowski "aware" that she had scheduled the appointment. Mother also failed to provide a release.

5.

**{¶ 15}** In any event, following the evaluation at Ohio Guidestone, mother was diagnosed with "severe stress with other mental health disorder" and with cannabis use. The provider recommended that mother engage in mental health therapies and an intensive outpatient program ("IOP") for her cannabis use. Mother did neither.

**{¶ 16}** After Ohio Guidestone, Grabowski and mother "talked about using a different provider." In January of 2024, mother completed a second dual assessment at Unison, again without a referral, which Grabowski described as a "[s]imilar situation." At Unison, mother was diagnosed with major depressive disorder, recurrent and moderate, and post-traumatic disorder. Following the assessment, Grabowski discussed "the recommendations" made by Unison and asked mother why "she didn't engage." Mother claimed not to know that any recommendations had been made but promised to call Unison and "get it figured out." Grabowski testified that she does not know if mother "ever made that phone call," but she did not engage in any treatment there.

**{¶ 17}** Mother underwent an "updated assessment" at Unison a month later, in February of 2024. This, too, was done without a referral, through "no fault" of mother. Afterward, Grabowski spoke with the provider and learned that mother had self-reported that she "did not need any mental health services [and that] she had no history of mental health." Based on her self-report, Unison did not recommend any services. Grabowski stated that the provider "would have" recommended services if an accurate history had been provided.

6.

{¶ 18} According to Grabowski, none of the assessments were valid. When asked if mother had engaged in "any sort of mental health treatment," Grabowski testified, "[n]ot that I'm aware of. I know that she had stated she was seeing someone at Ohio Guidestone briefly in the winter of [2023], but not that I was able to confirm." Grabowski also confirmed that mother never engaged in any substance abuse treatment.

{¶ 19} Based upon mother's long-standing use of cannabis and alcohol, drug screens were required as part of mother's case plan. Grabowski testified that mother was "inconsistent" in providing drug screens. For example, mother had several "no shows" and tested positive for THC "[o]n at least two to three occasions" and tested positive for alcohol on "at least two occasions." Mother's positive THC tests in October and December of 2023 were at levels indicating that mother was using it on a "daily" basis. Mother's last test indicated that she had reduced or stopped using THC.

{¶ 20} As of the hearing date, LCCS had not referred mother to a parenting class yet, "due to [mother's] lack of engagement [and] lack of progress in other services." However, the agency did refer mother to two different domestic violence courses, and mother told Grabowski that she had begun both. Mother is not currently employed, and Grabowski does not know how mother supports herself.

{¶ 21} When the case was reopened, mother reported living in an apartment, but when Grabowski made an "unannounced" visit there, she found it vacant. Grabowski believes that mother did live there at one point, "based on 911 reports [for that address]." Prior to the hearing, mother was living at the Family House, a homeless shelter for

7.

families, but she was unlikely to remain there, after Child 4 was removed from her care. Mother told Grabowski that she "has no definitive plans" but that she is "looking into another shelter."

{¶ 22} Grabowski described mother as "inconsistent" also with regard to her visits with J.S., adding that mother "never actually physically engages with [J.S.]" and frequently leaves visits early. According to Grabowski, J.S. has "lately" refused to visit with mother, and no visits occurred in the two months preceding trial. Although LCCS does not typically allow a young child to "refuse" to visit with a parent, it did so here because J.S.'s behaviors "escalate" at the time of visits. Grabowski testified that J.S. will get "physical" and run away or hide, and on "at least one occasion," she "had such strong behaviors" in the two-hour ride to the visit, that it was not safe for the driver to proceed. In Grabowski's opinion, J.S. and mother are not bonded to one another.

{¶ 23} Grabowski also observed J.S. at her foster-home, her second since leaving grandmother's care. Grabowski testified that J.S. "bought in" with foster-parents "very, very quickly" and is "bonded" to them. Although foster-parents "would" be willing to adopt, they believe that J.S. "would do better in a home with less children." Grabowski conducted a search of suitable relatives but could not find any, and neither parent identified any.

{¶ 24} J.S. has fetal alcohol syndrome, and because of that, she has "a lot of behaviors" and "needs" that require "structure," such as "rules and time [to] succeed." Grabowski testified that J.S. needs someone who can "maintain that structure," by, for

8.

example, maintaining a stable house and having "that extra patience." In Grabowski's opinion, mother is not able to provide a safe, stable, or permanent environment for J.S. because none of the agency-identified concerns have been addressed. Grabowski opined that it would be in J.S.'s best interest if permanent custody was granted to LCCS.

**The Guardian Ad Litem**

{¶ 25} Robin Fuller has served as the GAL with regard to all of mother's children. Fuller's May 8, 2024 report in this case was admitted at trial.

{¶ 26} Fuller described mother as "very cooperative" and "totally different" than when she first met mother in 2014, in that mother was "calmer" and "more stable appearing" and "more. . . like an adult." Fuller added, however, that for "[m]ost of the time that I have known [mother] she's been homeless in a shelter or with some guy that's not treating her the way she should be treated."

{¶ 27} Fuller met with J.S. "numerous times," which included observing visits between J.S. and mother. Based on those observations, Fuller concluded that J.S. is not bonded to mother and becomes "real confused" as to who mother is. During one visit, J.S. referred to mother by her first name and to foster-mother as "her mom." Fuller added that J.S. "has never really" viewed mother as being *her* mother because mother has "never cared for her." Instead, it's "always" been someone else.

{¶ 28} Fuller concurred with the caseworker's assessment, that mother mostly "sat on the couch and watched [J.S.] play," rather than "get on the floor" and play with her.

9.

Fuller also expressed "concern[]" and "anger" that mother would "miss or leave [visits] early," especially because J.S. had to drive "so far" to make the visit occur.

{¶ 29} Fuller does not believe that mother is able to care for J.S. She testified that, "I would have concerns for housing, alcohol, substance abuse, domestic violence, [and] employment." Fuller questioned how mother would "support" J.S., especially because J.S. has "special needs" and because mother failed to "follow through" with mental health and substance abuse services. Fuller recommended that LCCS's request for permanent custody of J.S. be granted.

{¶ 30} Fuller said that J.S. is doing "great" in her current placement and that she has "made a lot of progress in that home." And, while foster parents "love [J.S.]," they feel that she needs "more parental attention" than they can give in a home where there are "too many kids." Foster parents are "going to keep [J.S.] until she's adopted."

## C. The court grants LCCS's motion.

{¶ 31} On May 21, 2024, the trial court granted LCCS's motion, terminating parental rights as to mother and father and awarding permanent custody of J.S. to LCCS. Mother appealed and assigned the following error for our review:

> **ASSIGNMENT OF ERROR I**: The finding of permanent custody being in the children's best interest was against the manifest weight of the evidence as Mother made substantial progress in case plan services.

## II. Law and Analysis

{¶ 32} Parents have a fundamental liberty interest in the care, custody, and control of their children. *In re K.H.,* 2008-Ohio-4825, ¶ 39. However, the right to parent one's

children is not absolute; it does not give a parent a right to abuse or neglect a child. *Id*. at ¶ 40. The state has broad authority to intervene to protect children from abuse and neglect. *In re C.F*., 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. "An award of permanent custody, which terminates parental rights, is a last resort and is only justified when it is necessary for the welfare of the child." (Citation omitted.) *In re L.R.-L*., 2023-Ohio-2071, ¶ 24 (10th Dist.). Because granting permanent custody terminates parental rights, "parents 'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 33} R.C. 2151.414 sets forth "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.,* 2020-Ohio-5102, ¶ 18, citing *In re C.F.* at ¶ 22. As relevant here, the court must find by clear and convincing evidence "(1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1)." *Id.*

{¶ 34} All of the court's findings under R.C. 2151.414 must be supported by clear and convincing evidence. *In re T.J*., 2021-Ohio-4085, ¶ 36 (6th Dist.). "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *In re Alexander C*., 2005-Ohio-6134, ¶ 37 (6th Dist.) ("Clear and convincing

11.

evidence is a higher degree of proof than preponderance of the evidence, but a lower degree than beyond a reasonable doubt.").

{¶ 35} The Ohio Supreme Court recently clarified the standard of review in permanent custody cases. In *In re Z.C.,* 2023-Ohio-4703, the court held that,

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate, depending on the nature of the arguments that are presented by the parties. *Id*. at ¶ 11 (Rejecting abuse-of-discretion standard in termination proceeding).

{¶ 36} Sufficiency of the evidence and manifest weight of the evidence are "distinct concepts and are 'both quantitatively and qualitatively different.'" *Id*. at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 (1997), paragraph two of the syllabus. "We have stated that 'sufficiency is a test of adequacy,' * * * while weight of the evidence 'is not a question of mathematics, but depends on its effect in inducing belief.'" (Emphasis sic.) *Id.*, quoting *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990)

### A. The trial court's findings under R.C. 2151.414(B)(1) were supported by clear and convincing evidence.

{¶ 37} As discussed, the juvenile court must find by clear and convincing evidence that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies. R.C. 2151.414(B)(1)(a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot

12.

be placed with either parent within a reasonable time or should not be placed with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

{¶ 38} Here, the juvenile court found that R.C. 2151.414(B)(1)(a) applies to this case. A finding that Section (B)(1)(a) applies requires a juvenile court to consider whether the factors enumerated in R.C. 2151.414(E) are present that would indicate that a child "cannot be placed with either parent within a reasonable period of time or should not be placed with the parents." R.C. 2151.414(E); *In re B.K.*, 2010-Ohio-3329, ¶ 42-43 (6th Dist.). "If the court determines, by clear and convincing evidence, . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" *Id.* The juvenile court need only find the presence of one R.C. 2151.414(E) factor "to support its holding." *In re C.F.*, 2007-Ohio-1104, ¶ 50.

13.

{¶ 39} Here, the juvenile court found that Sections (E)(1) and (2) apply as to mother.   We address the trial court findings below. [1]

### 1.  R.C. 2151.414(E)(1)

{¶ 40} Under R.C. 2151.414(E), if the court finds that the following condition exists, the court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 41} Here, the juvenile court found that mother failed to remedy the problems that caused J.S. to be removed because she (1) "failed to complete the recommended case plan services;" (2) completed several dual diagnostic assessments without an agency referral and "therefore accurate recommendations may not have been made;" (3) "failed

---

[1] Mother's brief includes several mistatements.  First, she states that the juvenile court found that "the children" in this case were in the care of LCCS for 12 of the past 22 months, a reference to R.C. 2151.414(B)(1)(d).  Of course, this case involves one "child" only, and the trial court found that Section (B)(1)(a) applied to this case, not Section (B)(1)(d).  Indeed, J.S. was not in LCCS's temporary custody for the requisite amount of time for that section to apply.  Separately, mother also states, incorrectly, that the juvenile court found that R.C. 2151.414(E)(4) applied to mother.  As discussed above, the court determined that Section (E)(1) and (2) applied.

14.

to engage in any of the recommended mental health and substance abuse services;" and (4) lacks "independent stable housing at this time."

{¶ 42} Mother disputes the court's findings. She claims to have made "considerable progress" in her case planning because she "completed" three dual diagnostic assessments and "completed" programs in anger management and parenting and "was providing" negative drug screens. We disagree with all of mother's arguments.

{¶ 43} First, a "valid" dual assessment was never obtained in this case, due to the lack of a referral. As explained by the GAL, a referral is "imperative" because it presents the evaluator with the "the whole picture." Further, mother bears primary responsibility for the lack of referrals because "she was told three times." The juvenile court clearly faulted mother for the lack of a referral in this case, expressing "baffle[ment]" that mother insisted on doing things her "own way," rather than "doing exactly what [was] required. . . like 100 percent or more."

{¶ 44} As for mother's participation in anger management and parenting courses, the record establishes that she did those "on her own accord" and not at LCCS's request. That is, mother's case plan did *not* include anger management services, and because of her failure to progress in her case plan, she was never referred for parenting services.

{¶ 45} While mother tested negative for drugs late in this case, the record also includes evidence that she missed some drug screens, which the juvenile court noted is "considered a positive drug screen." Alarmingly, mother also "clearly [had] positive drug screens" *during* her pregnancy with Child 4.

15.

**{¶ 46}** Mother claims that she ought to be provided "more time." But, as expressed by the GAL, mother was given "the time to do what she needed to do, [but] she didn't follow through with mental health and substance abuse." We agree. In our view, the reopening of this case, occasioned by grandmother's change in health, represented a second chance for mother and her relationship with J.S. And yet, mother has *completely failed* to acknowledge, much less address, two of the most vexing issues that have plagued her for years—her mental health and substance abuse—despite the fact that these are the two issues that caused mother to lose custody of three of her children.

**{¶ 47}** A parent "is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing [a child's] removal." *In re A.L.A.,* 2011–Ohio–3124, ¶ 108 (11th Dist). (Finding that mother was not entitled to more than the 18 months that had elapsed since the case plan in that case was filed). We find that the record contains clear and convincing evidence to support the juvenile court's findings under R.C. 2151.414(E)(1) that mother failed "continuously and repeatedly to substantially remedy the conditions" that led to J.S.'s removal. We further find that the trial court's findings are supported by sufficient evidence and not against the manifest weight of the evidence.

### 2. R.C. 2151.414(E)(2)

**{¶ 48}** Under R.C. 2151.414(E), if the court finds that the following condition exists, the court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is

16.

so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code; * * *

{¶ 49} Some of the juvenile court's findings under Section (E)(2) mirror those with respect to Section (E)(1). Thus, the court found that mother "suffers" from "severe chronic mental illness and chemical dependency," and despite being "given diagnoses and treatment recommendations," she has "failed to engage in any of the recommended services." The court also found that mother failed to "present any evidence that she has remedied her mental health or substance abuse concerns." It found that mother's prior cases with LCCS were particularly relevant, given that those cases involved her longstanding mental health and substance abuse problems, and her "fail[ure] to complete services" caused her to lose custody on three separate occasions, including J.S. in 2019.

{¶ 50} Mother does not challenge any of the court's findings under Section (E)(2), and the record contains clear and convincing evidence to support those findings. That is, mother's chronic mental health and substance abuse issues are so severe that they render her unable to provide an adequate permanent home for J.S. at the present time and for the foreseeable future.

{¶ 51} Regardless, the trial court was only required to make findings under *one* subsection of R.C. 2151.414(E) to support its decision. *Carlos R.*, 2007-Ohio-6358, ¶ 38 (6th Dist.). Here, the trial court found that J.S. could not or should not be returned to mother under Sections (E)(1) *and* (2). Because we have already found that the record

17.

supports the trial court's findings under Section (E)(1), we must conclude—consistent with R.C. 2151.41(B)(1)(a)—that the trial court was required to enter a finding that J.S. could not be returned to mother within a reasonable time or should not be returned to mother.

### B. Mother's arguments relating to the trial court's best interest determination are entirely baseless.

{¶ 52} Finally, mother criticizes the trial court's best interest determination because—according to her—J.S. "never expressed her wishes or feelings regarding Mother" and the GAL never observed "mother with the child."

{¶ 53} The GAL testified, however, that she "met with [J.S.] numerous times [and] *observed the child with mother and father*, and with foster parents, both sets of foster parents." (Emphasis added.) The record similarly undercuts mother's claim that no evidence was offered regarding J.S.'s "wishes." *See, generally* R.C. 2151.414(D)(1) ("In determining the best interest of a child. . . the court shall consider. . . (b) [t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child."). At trial, Fuller was asked whether J.S.— who was six years old at the time—was able to express her opinion as to "what she would like to have happen." Fuller responded that J.S. "has made it clear to me that . . . the foster home is her family. [S]he's made that clear and by refusing to come to visits [with mother]." In short, mother's best interest arguments are entirely baseless.

18.

### III. Conclusion

**{¶ 54}** For the reasons expressed above, we find that the trial court's decision was supported by clear and convincing and sufficient evidence and was not against the manifest weight of the evidence. We further find that the mother's assignment of error is without merit. Therefore, the May 21, 2024 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, costs of this appeal are assessed to mother.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                                _____
                                                               JUDGE

Christine E. Mayle, J.          

Charles E. Sulek, P.J.                                      _____
CONCUR.                                                             JUDGE

_____
                                               JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.