[Cite as *In re M.Y.*, 2026-Ohio-1892.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

IN RE M.Y., J.Y            COURT OF APPEALS NO. L-25-00278

TRIAL COURT NO. 24297849

**DECISION AND JUDGMENT**

Decided: May 22, 2026

* * * * *

Kevin Ankney, Esq., for appellee, Lucas County Children Services.

Dan M. Weiss, Esq., for appellant, mother.

* * * * *

**MAYLE, J.,**

{¶ 1} Appellant, M.R. ("mother"), appeals the November 5, 2025 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her children, M.Y. and J.Y. Jr., to appellee, Lucas County Children Services ("LCCS").[1] For the following reasons, we affirm.

---

[1] J.Y. Sr. ("father"), the children's father, did not appeal the trial court's decision.

## I. Background and Facts

### A. Pretrial

{¶ 2} On January 9, 2024, LCCS filed a complaint alleging that the children were dependent and neglected. The complaint claimed that LCCS received a referral in late November 2023 alleging that police had been dispatched to the family's home a week earlier for a domestic violence incident. When they arrived, they forced entry into the home. Mother told officers that she and father got into an argument because mother was on the phone, and father ripped the phone from her hand, grabbed her, and punched her in the face. Mother was bleeding and had multiple bruises on her face.

{¶ 3} The same day, LCCS received another referral claiming that M.Y. had been enrolled in Toledo Public Schools for nearly two months but had only attended school eight days since her enrollment.

{¶ 4} A month after receiving the referrals, an LCCS caseworker was finally able to contact father, who denied any incidents of domestic violence and reported that nothing happened. He also denied that mother was the victim of his prior assault charge.

{¶ 5} The day before LCCS filed the complaint, it held a staffing meeting that mother and father both attended. Father minimized the violence between him and mother. LCCS had "concerns regarding Mother's protective capacities."

{¶ 6} At the shelter care hearing, the trial court granted LCCS interim temporary custody of the children.

{¶ 7} At the adjudication and disposition hearing on February 27, 2024, mother and father agreed to a dependency finding. The magistrate found that the children were dependent, and the trial court adopted the magistrate's decision.

{¶ 8} On April 22, 2025, LCCS moved for permanent custody of the children. In its motion, the agency alleged that it became involved with the family when it received a referral due to a domestic incident between mother and father. During its investigation of that incident, LCCS learned that M.Y. was not attending school.

{¶ 9} LCCS also has history with the family. In 2020, LCCS received a referral because of a domestic violence incident between mother and father that sent mother to the hospital. M.Y. was present when that incident happened.

{¶ 10} LCCS attempted to work with the family but ultimately ended up filing a complaint in dependency and neglect. The children were adjudicated dependent. As part of its findings of fact from the adjudication hearing, the trial court noted that father was convicted of domestic violence related to the incident that started this case, and that mother was the victim of father's negligent assault conviction from 2020.

{¶ 11} The case plan that the court approved for mother included a dual-diagnosis assessment, following all recommendations from the assessment, parenting classes, domestic violence services, and "[n]on-offending caregiver parenting classes." LCCS admitted that mother had engaged in case plan services throughout the case. She had recently reengaged with counseling services, although her service provider said that she was not an active client. She was receiving psychiatric services every other month.

3.

Mother completed domestic violence counseling during her regular therapy sessions, but LCCS "would like to see Mother complete a more formal domestic violence survivor program" because the agency "still has concerns due to reports of Father being in Mother's home during level 3 visits." Mother had been attending and participating in a parenting program, but there had not yet been any observations of her parenting. She had submitted to random drug screens throughout the case and had tested positive for THC. She admitted to using THC to help her sleep.

{¶ 12} Mother had been visiting with the children in her home, unsupervised. However, her visits were moved back to LCCS because both children reported that father was in the home during visits. Mother generally denied that father was there but admitted that she called him once because she needed assistance with her vehicle. LCCS was concerned that M.Y. was sexually abused by father during one of her visits in mother's home. It was also "concerned that Mother continues to question and doubt [M.Y.'s] disclosures." During a recent visit, mother told the children that the agency intended to file for permanent custody, that they would be placed in a different home, and that no one would adopt M.Y. This upset the children and caused J.Y. to regress with bedwetting.

{¶ 13} In April 2025, mother was charged with cruelty to animals, a second-degree misdemeanor. The complaint in that case noted that mother was being evicted from her home and moved out, leaving three dogs behind. Two dogs were in cages, which were covered in garbage. The dogs appeared to be without food and water for several days. The third dog was found dead in the home, due to what the police believed

4.

to be starvation. At the time that LCCS filed the permanent custody motion, this charge was still pending.

{¶ 14} The agency asked the court to award it permanent custody because the children had been in LCCS's custody for 12 or more months of a consecutive 22-month period beginning when they were adjudicated dependent on February 24, 2024. Alternatively, it argued that the children could not or should not be placed with mother within a reasonable period of time because (1) notwithstanding reasonable case planning and diligent efforts by the agency to assist her to remedy the problems that initially caused the children to be placed outside the home, mother had failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home; (2) mother had demonstrated a lack of commitment toward the children by taking actions that showed an unwillingness to provide an adequate permanent home; and (3) mother was unwilling to prevent the children from suffering physical, emotional, or sexual abuse, or physical, emotional, or mental neglect.

{¶ 15} The agency also argued that permanent custody was in the children's best interests because

> the children need a legally secure, permanent placement that can only be achieved by an award of permanent custody. The child has been in the temporary custody of LCCS for twelve months. The parents have not remedied the problems causing the child's removal. The child has formed positive relationships with his foster parents. LCCS cannot recommend reunification or a temporary custody extension because Mother, despite appropriate case plan services, has failed to remedy the concerns that caused the children to be removed from the home . . . .

5.

**B. Permanent custody hearing**

{¶ 16} At the permanent custody hearing, LCCS presented the testimony of LCCS caseworker, Rachel Eades, and the children's guardian ad litem, Andrea Rentner. Mother testified in her own behalf.

**1. LCCS's case**

{¶ 17} Eades testified that she became the family's ongoing caseworker in January 2025. From reviewing the file, she knew that the agency became involved with the family in November 2023 when it received a referral that the police were called to the family's home because of an argument between mother and father, during which father grabbed the phone out of mother's hand and punched her in the face. The police report noted that mother was bleeding. LCCS received a second referral on the same day that M.Y. had been enrolled in school since early October but had only attended for eight days.

{¶ 18} Based on the agency's concerns, it created a case plan for the family with the goal of reunification. The case plan also hoped to remedy the domestic violence between mother and father. Mother's case plan services included undergoing a dual-diagnosis assessment and following any recommendations from that assessment, domestic violence counseling, and parenting classes. Mother completed her dual assessment, which recommended individual counseling at least every other week to address her PTSD and other mental health diagnoses. Although mother did not receive a

6.

recommendation related to substance use or abuse, she did admit to smoking marijuana daily to help her sleep.

{¶ 19} Mother was initially compliant with her therapy recommendation, but she stopped attending therapy sessions after early October 2024. In spring of 2025, mother told Eades that she had gone back to therapy, but when Eades requested records from the new service provider, the service provider said it did not have a record of mother attending. In August 2025, mother began attending therapy again. She consistently attended her appointments in August, but in September 2025, appointments were canceled because mother was either late or did not show, and as of September 25, the therapist had not had any contact with mother. Attendance records from mother's therapist reflect that mother has not been engaged in therapy since September 25, 2025. However, mother told Eades that she had reengaged with therapy the week before the permanent custody hearing and had therapy appointments scheduled. Eades was not able to confirm those appointments.

{¶ 20} Around the same time that mother was actively participating in therapy in 2024, LCCS referred her for domestic violence services. Because of issues with her insurance, the agency agreed to allow her to do therapy for domestic violence through her individual therapist in Michigan. Mother completed her domestic violence therapy in August 2024.

{¶ 21} Around the summer of 2024, the agency recommended that mother have level 3 visits with the children, which it usually recommends when parents are compliant

7.

with services, they have most of their services completed, and the agency is preparing to start working toward the reunification process. At first, the level 3 visits were going well. However, there were eventually concerns that the children were having contact with father during mother's level 3 visits. Eades said this was problematic because of the domestic violence concerns, father's failure to follow through with his recommendations for services, and father's failure to comply with the terms of his probation. When Eades asked mother about the visits, mother admitted that she had contacted father once to pick up the children when she had car trouble but denied being around him any other times. At the time of the hearing, mother was visiting the children consistently and there were no concerns noted from the visits.

{¶ 22} In October 2024, the agency received a referral reporting that M.Y. had been sexually abused. M.Y. met with a Dr. Schlievert, who investigated the report of sexual abuse. Schlievert recommended that M.Y. not return home to mother's or father's care, mother's visits be held at a third-party location, and if the agency decided to return the children home, "it was strongly advised that it would be a sustained evidence that the home was violence free, drug free and abuse free." Based on Schlievert's recommendations, LCCS added a parenting class to mother's case plan in January 2025. Mother completed two classes and had two observations after the classes were finished. There were no concerns based on the classes or observations. Mother appropriately parented the children during the parenting observations.

8.

{¶ 23} In April 2025, mother was charged with animal cruelty. According to two of the complaints filed in the municipal court, mother

> did knowingly deprive three companion animals (dogs) of necessary sustenance and confined them without supplying them with any food or water. The animals were found in cages and covered in items, such as televisions, bike parts, and garbage bags. This caused Officers to believe that the intent was to leave the dogs hidden. Two of the dogs were found visibly malnourished and one puppy (found in an upstairs room) was found deceased with its ribs visible to the eye. There was a strong smell of decay in the home.

{¶ 24} The third complaint alleged that mother

> did knowingly confine three of her dogs and deprive them of necessary sustenance food and water. [Mother] stated that she was being evicted and moving out . . . and that she left the dogs there.

> This Officer discovered two adult pitbulls in cages with garbage (trash bags, blankets, bicycle parts, TV's . . . ect [sic]) piled on top of them, hiding them from sight. There was an abundance of feces and urine in the entire home. The dogs had no food or water and appeared to have been left there for several days. They appeared emaciated, this Officer could see the rib bones of the animals.

> Another pitbull, a puppy, was discovered in the upstairs bedroom of the home, deceased. It was clear that the puppy had starved to death, as the bones were clearly visible.

> Two witnesses stated that the dogs did indeed belong to [mother].

(Second ellipsis in original.) Mother pleaded no contest to the charges, and the court found her guilty and sentenced her to 90 days in a work-release program, which mother had yet to serve. When Eades spoke to mother about the charges, mother told Eades that, when she moved back to Michigan, she left her dog with a friend who was going to care for the dog. Although mother left the friend with food for the dog, mother did not know

9.

that the friend was leaving the dog in that condition. This incident caused the agency "concerns that mother makes poor decisions on the people that she trusts, and that it could impact her decisionmaking [sic] with her children of who she will allow around them."

{¶ 25} Throughout the case, mother submitted to random drug screens. Every time she tested, her screen came back positive for THC. Mother's marijuana use concerned Eades because there had been reports that M.Y. had "gotten into her stash and smoked her vape," which mother admitted to, and reports that mother was possibly smoking with father.

{¶ 26} At the time of the hearing, mother was living with her parents in Michigan. Although the home was in good condition, there was "not really space for more people" because the bedroom, living room, and basement were occupied by mother, her parents, and her brother. Additionally, mother reported that her brother has a substance abuse problem, which was a concern for the agency.

{¶ 27} Despite the progress mother had made on her case plan and the lack of issues with mother's visits, LCCS was still pursuing permanent custody of the children. It was doing so primarily because mother did not have stable housing and was living with someone with a substance abuse problem, she was inconsistent with her therapy, and the agency had concerns that "even though she loves her children, she doesn't have the ability to protect them from potential harm in the future. And that to send them back we would put these children at some really big risk." Eades was not sure whether mother

was having contact with father but based on statements that had been made to her, she believed that it was possible. Eades did not believe that mother could offer the children a safe, stable, permanent home.

{¶ 28} Eades tried to discuss placement of the children with maternal grandmother multiple times, but she did not respond to a message that Eades left with maternal grandfather or answer phone calls, and Eades was unable to leave voicemails for grandmother because her voicemailbox was not set up. Eades talked to mother about having grandmother call her, but "at no point" was Eades able to get ahold of grandmother to speak to her about the children.

{¶ 29} Mother also gave Eades the names of other people who could potentially take custody of the children. LCCS investigated the ones it was able to find contact information for, but none of the identified people were suitable for placement of the children.

{¶ 30} Regarding the children, Eades testified that they had been in LCCS's temporary custody since March 2024.

{¶ 31} The children were required to do trauma counseling because they had witnessed domestic violence. For a while, they were attending weekly therapy sessions in person. They then switched to a different agency with weekly virtual therapy sessions. M.Y. was attending a second virtual therapy session each week, but there were issues with the therapist not showing up, so the second session had been dropped. Eades did not

11.

believe that the children would continue to receive therapy if they went back to mother's custody, based on mother's engagement with her own therapy.

{¶ 32} The children's foster parents were potentially interested in adopting them but did not want to "make any decisions until things would be settled one way or the other."

{¶ 33} The children exhibited some problematic behaviors while in foster care. M.Y. displayed a lot of sexualized behaviors in the home and stole things. The children also fought quite a bit. However, the behaviors had decreased significantly.

{¶ 34} Eades believed that it was in the children's best interests for LCCS to receive permanent custody because "[a]t this point they're unable to return home. It's not safe for them to go home, and I don't believe that mom possesses the protective capacities to protect them from harm." She did not believe that mother could do anything in the two months remaining on the case to show that she could offer the children a safe, stable, and permanent home. She said that she had been discussing mother's housing situation with her for months and, although mother was on a waiting list, she had never followed up. Additionally, when Eades talked to mother about her services, mother would tell Eades that she was attending, but the records Eades obtained "do not match what mom is telling [Eades]."

{¶ 35} On cross-examination, Eades admitted that mother completed a dual-diagnosis assessment, completed domestic violence programming, attended counseling off and on, and successfully completed parenting classes and observations.

12.

{¶ 36} Mother got a protection order against father when the protection order issued in the criminal case against father was no longer in place. She claimed that she did so because "nobody believed her that she wasn't having contact with the dad." Eades talked to mother about transferring the protection order to Michigan since she was living there now, but mother had not done so, despite living in Michigan for at least ten months.

{¶ 37} Eades admitted that M.Y.'s need for therapy was not fully being met in her foster home. She also conceded that "we have similar problems in the foster home that [she had] concerns in the future might happen with the mother" because some of M.Y.'s therapy appointments were not working out.

{¶ 38} Eades said that the foster parents are very loving toward the children, and the children seem well bonded to the foster parents and their family. Eades clarified that the foster parents were not "asking that [the children] be removed from their home, and they have indicated some interest" in adopting the children; they were "just not ready to commit."

{¶ 39} Regarding Eades's concerns about father being around during mother's visits, Eades said that the children reported that father was at mother's home during unsupervised visits. Although there were no issues with mother's supervised visits, the foster parents reported that the children fought and argued more after visits.

{¶ 40} On redirect examination, Eades clarified that she did not have concerns with the children being in virtual therapy; she was concerned that mother would not keep them enrolled in therapy at all.

13.

{¶ 41} Rentner, the children's GAL, testified that she investigated the case. Based on the information that she learned, she believed that it was in the children's best interests for LCCS to receive permanent custody.

{¶ 42} According to Rentner, at one point in the case, mother was "doing great" and had level 3 visits with the children. Rentner was in favor of those visits and did not have any concerns at first. As the visits continued, however, the children began making statements in September or October 2024 that father was at mother's house almost every time they were there. Rentner and the prior caseworker did not see father at the visits, but the children's stories were consistent with each other.

{¶ 43} Since the change in visits, "Mother has not made much progress at all . . . ." She did not reengage in counseling, did not make any progress toward reunification, and generally made poor decisions. Mother not being in counseling concerned Rentner because mother was "doing great" while she was in counseling. Rentner saw "huge growth" in mother's ability to recognize that father was a bad influence and that she should not put up with that, and in mother's understanding of the children's behaviors and how to handle them. When mother stopped attending counseling regularly in October 2024, Rentner noticed that she "went back to her old ways."

{¶ 44} As an example of mother's "poor decisions," Rentner pointed to the situation that led to the animal cruelty charges. Mother moved but did not tell her landlord that she moved. She gave a friend money to take care of the dogs but never checked on the dogs or thought to take them to the dog warden. This situation caused

14.

Rentner concerns about mother's ability to parent the children because "if she can't follow through to take care of her animals that I know she loves, to make sure that they're being well taken care of, I don't know if she'll follow through with meeting [the children's] needs. And they have a lot of needs." Rentner also explained that mother got the protection order against father "mostly just because we were constantly on her about, hey, you really need to get this," and she did not want to get a protection order in Michigan because she did not think that father would come to Michigan. And she pointed to a time when M.Y. took mother's marijuana vape pen and smoked it. Mother did not know about M.Y. doing that at the time and claimed that it would not happen again but could not say what steps she would take to make sure that M.Y. does not get ahold of her marijuana.

{¶ 45} Regarding grandmother's interest in caring for the children, Rentner testified that grandmother did not want to take care of the children because her son is an addict and had mental health issues and she does not want to expose the children to that. Rentner had not spoken to grandmother recently because grandmother had not returned her calls and she could not leave a message because grandmother's voicemailbox was not set up.

{¶ 46} Rentner did not believe that mother could offer the children a safe, stable, permanent home environment at the time of the hearing or within the time left on the case. She was recommending permanent custody to LCCS as in the children's best interests.

15.

## 2. Mother's testimony

{¶ 47} Mother testified that she completed domestic violence counseling, which taught her about her own trauma and how that affected the children. She also completed parenting classes, which taught her how to deal with different behaviors. She did not "really have a reason" why she was so inconsistent with her therapy appointments. She was currently in counseling and had been since August 2025. She admitted to using marijuana "[o]ccasionally, not as much."

{¶ 48} Mother claimed that she had not communicated with father since November 2024. She had heard from father's siblings about a week before the hearing that he was in Texas.

{¶ 49} Mother told the court, "I would like to see my kids come back with me. I know that I haven't made some of the best decisions in the last year, but I don't think that that should affect them to come home to me. I am trying to fix my housing situation." She also explained that her 90-day term of work release was scheduled to start the Tuesday after the permanent custody hearing. If the court returned the children, mother said that she would keep them in therapy. However, she did not have an answer for how she planned to do get the children to their appointments when she was unable to get herself to her therapy appointments.

{¶ 50} On cross-examination, mother admitted that she was not in therapy from October 2024 to August 2025. She also admitted to contacting father in the summer of 2024 when she had car trouble while she had the children and to maintaining contact with

16.

him off and on through November 2024. Based on things M.Y. said after meeting with Schlievert, mother had concerns that father had sexually abused M.Y. She did not have concerns about sexual abuse before the investigation began.

{¶ 51} Mother was living with her parents and brother. Her brother had an alcohol-abuse problem but was not actively drinking at the time of the hearing.

{¶ 52} While mother was in the work release program, grandmother said that she would take care of the children, but grandmother did not want to "take full custody" of them.

### C. Trial court's decision

{¶ 53} At the end of the permanent custody hearing, the trial court granted LCCS's motion for permanent custody. The court found that permanent custody was appropriate because the children had been in LCCS's temporary custody for 12 of 22 months and because R.C. 2151.414(E)(1) applied to mother. The court

> acknowledge[d] that mom has completed a number of services, but this gap in time could have really addressed a lot of the concerns that brought us here today. And I am just compelled to issue this decision. There isn't sufficient time at this point in the case. We do have a two-year mark. We're going to be approaching that. And even if there would be sufficient time for us to see a change, which it wouldn't, but even if it would be, you're going to be unavailable because you're going to be incarcerated for part of that time.

The court also found that LCCS had made reasonable efforts to reunify the family.

{¶ 54} In its judgment entry, the trial court found clear and convincing evidence that the children could not be placed with the parents within a reasonable time and should

not be placed with the parents and that awarding permanent custody to LCCS was in the children's best interests.

{¶ 55} The court found under R.C. 2151.414(B)(1)(a) that the children could not be placed with either parent within a reasonable time and should not be placed with either parent.

{¶ 56} In determining that the children could not or should not be placed with mother, the court made a finding under R.C. 2151.414(E)(1). The court found that mother continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home, despite reasonable case planning and diligent efforts by LCCS. Although mother participated in case plan services, she failed to consistently engage in counseling; there were still concerns about her mental health, her decision making, and her housing; and she did not use the counseling she received to make changes to her life that would allow the children to return home. The court concluded that "Mother has had nearly two years to exhibit change, and an ability to care for her children, and it has not happened."

{¶ 57} Based on these factors, the court determined that LCCS presented clear and convincing evidence that the children had not been abandoned or orphaned, had not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and could not be placed with either parent within a reasonable time or should not be placed with either parent.

18.

**{¶ 58}** Additionally, the court found by clear and convincing evidence under R.C. 2151.414(B)(1)(d) that the children had been in the custody of LCCS 12 or more months of a consecutive 22-month period. The children were adjudicated dependent on February 27, 2024, and the agency filed its motion for permanent custody on April 22, 2025, over 13 months later.

**{¶ 59}** Finally, the court determined under R.C. 2151.414(D)(1) that it was in the children's best interests to award LCCS permanent custody. Specifically, the court found under R.C. 2151.414(D)(1)(a) that the children had been together in the same foster placement throughout the case, and there was a possibility that the foster parents might adopt them. They consistently visited with and were bonded with mother, but mother could not care for the children at the time of the hearing. LCCS made intensive efforts to find a kinship placement but was unsuccessful. The court determined that the totality of the circumstances surrounding the children's interactions and interrelationships showed that it was in their best interest for LCCS to receive permanent custody. Under (D)(1)(c), the court found that the children had been in the same foster home throughout the case. Despite the case being open for 21 months, mother was not ready to reunify with the children. Additionally, the children had been in LCCS's custody for 12 of the last 22 months. This factor also weighed in favor of awarding LCCS permanent custody. Under (D)(1)(d), the court found that a legally secure, permanent placement could not be achieved without awarding LCCS permanent custody. At the time of the hearing and for the foreseeable future, mother would not be able to provide a secure, stable, and

19.

consistent environment for the children. Although mother had made some progress, she had not consistently engaged in counseling or obtained housing, and she was going to be incarcerated for the three months following the permanent custody hearing. Despite searching for relative placements, the agency could not find any appropriate relatives.

{¶ 60} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of child to LCCS and terminated mother's parental rights.

{¶ 61} Mother now appeals, raising one assignment of error:

> The Trial Court decision to grant Lucas County Children Service's motion for permanent custody was against the manifest weight of the evidence and was not in the best interest of the children.

## II. Law and Analysis

### A. The law of permanent custody

{¶ 62} Revised Code 2151.414 provides the analysis that a trial court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency. Under that section, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a) through (e) exists. As applicable here, subsection (a) requires the court to find that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent. Subsection (d) requires the court to find that the child has been in the

20.

temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period.

{¶ 63} If the court finds that R.C. 2151.414(B)(1)(d) applies, the court must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1). *In re Dor.B.*, 2018-Ohio-2666, ¶ 64 (6th Dist.)

{¶ 64} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest and whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.*, 2010-Ohio-3329, ¶ 42-43 (6th Dist.).

{¶ 65} As relevant here, the court found that R.C. 2151.414(E)(1) was applicable to mother. The statute provides:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E). The court's finding that *any* (E) factor exists is sufficient to support an award of permanent custody to the agency. *In re S.J.*, 2024-Ohio-5137, ¶ 29 (6th

21.

Dist.); *In re Carlos R.*, 2007-Ohio-6358, ¶ 38 (6th Dist.) ("[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent . . . .").

{¶ 66} After finding that at least one factor in R.C. 2151.414(E) applies, the court must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 67} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. *In re J.S.*, 2025-Ohio-17, ¶ 34 (6th Dist.). "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 2004-Ohio-896, ¶ 14 (6th Dist.).

{¶ 68} The Ohio Supreme Court has clarified the standard of review in permanent custody cases:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.*, 2023-Ohio-4703, ¶ 11. Notably, the court rejected abuse-of-discretion review in these cases. *Id.* at ¶ 18.

{¶ 69} "The sufficiency of the evidence [standard] tests the adequacy of the evidence: a court of appeals should affirm a trial court when the evidence, if believed, is

22.

legally sufficient to support the verdict as a matter of law." *In re C.W.*, 2025-Ohio-282, ¶ 37 (10th Dist.), citing *Z.C.* at ¶ 13.

{¶ 70} In a manifest weight review, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.*, 2012-Ohio-3556, ¶ 20 (6th Dist.). If the evidence is susceptible to more than one interpretation, we are bound to interpret it in a way that is consistent with the trial court's judgment. *Z.C.* at ¶ 14, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984). The trial court's determination that an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re C.P.*, 2009-Ohio-2760, ¶ 10 (10th Dist.). Therefore, we will not find a permanent custody decision against the weight of the evidence if it is supported by some competent, credible evidence in the record upon which the trial court could have formed a firm belief as to all of the essential permanent custody findings. *In re I.H.*, 2020-Ohio-4853, ¶ 34 (6th Dist.).

23.

**B. The trial court's finding under R.C. 2151.414(B)(1)(d) supports the award of permanent custody.**

{¶ 71} In her assignment of error, mother argues that the trial court's finding under R.C. 2151.414(E)(1) is against the manifest weight of the evidence.[2]  Importantly, she does *not* argue that the trial court erred in making its 12-out-of-22 finding.

{¶ 72} "'[T]he findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, [and] each is independently sufficient to use as a basis to grant the Agency's motion for permanent custody.'"  (Brackets in original.)  *In re A.M.*, 2015-Ohio-2740, ¶ 14 (3d Dist.), quoting *In re M.R.*, 2013-Ohio-1302, ¶ 80 (3d Dist.).  "Because 'the first prong of the permanent custody test is satisfied where "one or more" of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) applies, the juvenile court's undisputed finding under [Section (B)(1)(d)] is sufficient to establish the first requirement of the statute.'"  (Brackets in original.)  *In re L.G.*, 2024-Ohio-4554, ¶ 44 (6th Dist.), quoting *In re R.A.*, 2022-Ohio-1748, ¶ 34 (6th Dist.).

{¶ 73} Here, the trial court made findings under both (B)(1)(a) and (B)(1)(d). Mother is challenging the trial court's (E)(1) finding, which is relevant only to the (B)(1)(a) finding.  That means that mother is not disputing the trial court's finding under (B)(1)(d), which is an independent basis for awarding LCCS permanent custody of the children.  Because the trial court correctly found that the children had been in LCCS's

---

[2] Although mother mentions best interests in her assignment of error, she does not make any arguments related to the trial court's best-interest findings in the body of her brief. Therefore, we need not consider that part of her assignment of error.  *See* App.R. 12(A)(2).

24.

temporary custody for 12 or more months out of a consecutive 22-month period, it made a (B)(1) finding that is supported by clear and convincing evidence and is not against the manifest weight of the evidence. Thus, the trial court properly awarded permanent custody of the children to LCCS. And, because we need not address the trial court's alternative finding under (B)(1)(a) to find that the court properly granted permanent custody to LCCS, we do not reach mother's arguments related to the trial court's (E)(1) finding. Mother's assignment of error is not well-taken.

### III. Conclusion

{¶ 74} We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's finding under R.C. 2151.414(B)(1)(d) is supported by clear and convincing evidence and is not against the manifest weight of the evidence. Mother's assignment of error is without merit.

{¶ 75} Therefore, the November 5, 2025 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.

_____
JUDGE

Christine E. Mayle, J.

_____
JUDGE

Charles E. Sulek, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

26.